[L. A. No. 7895. In Bank.—January 3, 1928.]

C. M. DRAPER, Respondent, v. HELLMAN COMMERCIAL TRUST AND SAVINGS BANK (a Corporation), Appellant.

Page & Hurt, Page, Nolan, Rohe & Freston, Rohe & Freston, Ralph E. Lewis, Eugene D. Williams and Albert M. Cross for Appellant.

W. I. Gilbert, Raymond L. Haight and Allen W. Ashburn for Respondent.

THE COURT.—This is an appeal by defendant, Hellman Commercial Trust and Savings Bank, a corporation, from a judgment awarding plaintiff $10,000 as damages

for the publication by defendant of alleged libelous communications concerning plaintiff. A judgment providing for $15,000 as compensatory damages and $5,000 as exemplary damages was originally entered upon the verdict of the jury, but thereafter defendant moved for a new trial, which was denied upon plaintiff's filing with the court a written consent to the reduction of the total amount of damages from $20,000 to $10,000. The court thereupon entered its order amending the judgment by reducing the amount of damages. The appeal is taken from the judgment as thus reduced.

Appellant conducts a general banking business in the city of Los Angeles and remains open for the receipt of deposits and the paying out of money until 12 o'clock midnight. Respondent was employed by appellant as a night teller between the dates of April 20, 1921, and October 15, 1921, when he voluntarily left the service of appellant bank, after having given two weeks' notice of his intention to quit and having told the head night teller that he was going to leave a month previously. He had worked for the Bank of Montreal at its branch in Brantford, Canada, in various capacities for more than eight years preceding his employment by appellant, and, according to his own testimony, had left Brantford for Los Angeles in the hope that the change of climate would benefit his health. He remained in Los Angeles for approximately two weeks after leaving the employ of appellant and then returned to Canada, where he was immediately re-employed by the Bank of Montreal. During said two weeks he called at the bank for the purpose of bidding his fellow-workers good-by. He left his Canadian address with certain of them and he himself wrote to three of them after reaching Canada. He was twenty-five years of age at the time of his employment by appellant.

During the latter part of October or the early part of November, 1921, two depositors, named J. P. Berry and John Burkhartsmeyer, respectively, appeared at appellant's banking house and claimed that they had each made a deposit of $100 in cash on October 15, 1921, the last day on which respondent worked for appellant, which had been received by respondent in the course of his duties as a

teller, but for which they had not been given credit on the books of the bank. The depositor Burkhartsmeyer had in his possession his bank-book, which contained an entry of the deposit alleged to have been made. Said entry bore the imprint of a rubber teller's stamp marked "15," which was the number assigned to respondent, and Burkhartsmeyer testified upon the trial that he was positive he made the deposit through respondent, Draper. The depositor Berry exhibited a duplicate deposit tag which respondent admitted upon the trial was in his handwriting and bore his stamp. Each teller was required to file all original deposit slips received by him at the end of the day's business and the deposit slips for the two deposits in question were not among those filed by respondent or by any other teller on October 15, 1921, or on· any other date. Each teller was also required to list the amount of every deposit received by him during the day on his daily teller's sheet. The total amount received by respondent, as noted on his teller's sheet, exactly equals the total found by adding together the amounts indicated on the deposit tags filed by respondent on October 15, 1921, which did not include tags for the deposits made by Burkhartsmeyer and Berry, and for the amount indicated on each tag there is a corresponding entry on the teller's sheet, but there are no additional entries on said sheet which might represent additional deposits, such as those made by Berry and Burkhartsmeyer. The amount of cash turned over by respondent on October 15, 1921, corresponded with the figures on his teller's sheet, which did not include the deposits of Berry and Burkhartsmeyer. The inference is irresistible that the appellant bank did not receive either the $200 delivered to respondent or the tags representing said deposits, and that said deposits were ignored in composing Draper's teller's sheet. Respondent, Draper, upon the trial of the action herein, denied absolutely abstracting any cash whatsoever, destroying deposit tags, or making false entries.

Upon receiving notice of the above stated facts from Percy W. Wilson, assistant cashier of appellant, Emanuel Cohen, one of its three vice-presidents, wrote a letter to the bank of Montreal, which is the first communication upon which the present action is based. Said letter is as follows:

"Los Angeles, November 16, 1921.
"Manager Staff Department,
"Head Office, Bank of Montreal,
"Montreal, Quebec, Canada.
"Dear Sir:
"We had in our employ for several months C. M. Draper, who left us on October 31st, and whose references show that he was in the employ of your branch at Brantford, Toronto, for a long time.

"We have information to the effect that he left to return to your city. We are anxious to learn his present whereabouts and have requested Pinkerton's National Detective Agency to locate him for us. Should he present himself to you we will much appreciate it if you will send us a wire, at our expense, telling us where he can be reached.

"Your attention will oblige,
"Yours very truly,
"EMANUEL COHEN,
"Vice-President."

On November 21, 1921, the Bank of Montreal, through its agent, the British American Bank of San Francisco, which it largely controlled through stock ownership, wired to appellant, stating that respondent was then in the employ of the Bank of Montreal and that he had a good record and asking to be informed of appellant's reason for requesting the Pinkerton Detective Agency to locate respondent. The Pinkerton Detective Agency in Los Angeles, at the direction of appellant's officers, on November 22d, sent to its San Francisco office the telegram which respondent claims constitutes the second libelous communication. Said telegram, which was in cipher, reads as follows when translated:

"Hellman Commercial Trust and Savings Bank had teller named C. M. Draper, quit there October fifteenth went to Montreal. On last day employment received several deposits, destroyed deposit slips kept money (stop) Hellman's wired Bank of Montreal, Montreal, Canada, asking if Draper in their employ advising we looking for him and received reply from San Francisco Branch, Bank of Montreal, asking for explanation (stop) You call personally Bank of Montreal immediately explain why inquiry being made regarding Draper secure present address."

An agent of the San Francisco office of the detective agency then exhibited a translation of the telegram to the British American Bank of San Francisco, which the Los Angeles agency had referred to in said telegram as the San Francisco Branch of the Bank of Montreal. The employee of the British American Bank to whom the telegram was shown made a copy of it and the message was then dispatched verbatim to the Bank of Montreal in Canada, which thereupon suspended respondent from its employ. The complaint set forth the publication of a third libelous communication. Respondent made no attempt to prove said libel upon the trial of the action herein and it will not, therefore, be considered.

■ The telegram of November 22d clearly charges respondent with having fraudulently appropriated funds of appellant and is libelous *per se*. Appellant contends that the truth of all charges made in the libelous communication as to respondent's having abstracted funds of appellant was established upon the trial; that even if said charges were not proved to be true, it cannot be held liable, for the reason that the communications were privileged; and that in any event it cannot be held liable for any injury to respondent's reputation resulting from the publication of the telegram of November 22d received by the San Francisco branch of the detective agency, or copies thereof, because it did not authorize said detective agency to send such a telegram. ■ In an action for libel, proof of the truth of the defamatory statements is an absolute defense. (*Snively* v. *Record Publishing Co.*, 185 Cal. 565 [198 Pac. 1]; *Chavez* v. *Times-Mirror Co.*, 185 Cal. 20 [195 Pac. 666]; 16 Cal. Jur. 60.) It cannot be held in the instant case, however, that appellant established as a matter of law the truth of the defamatory statements published by it or its agents concerning respondent. It was not shown that respondent, Draper, had the exclusive opportunity to embezzle the $200 and destroy the record of its receipt. Draper testified that there was a small aperture back of the steel grating separating the tellers' cages in appellant bank; that the tellers frequently passed materials back and forth between the cages, and that it would be possible for a teller to reach through said opening into the adjoining cage and remove whatever he might find near the opening. He further tes-

tified that the tellers usually left the door of their cages unlocked, except when they were at lunch, and that other tellers than the one in charge not infrequently entered the cage. It also appears from Draper's testimony that the teller in the cage adjoining his, who was the head night teller, upon finishing his own work, offered to assist Draper by listing on an adding machine on Draper's teller's sheet the amounts indicated on his deposit tags. For this purpose Draper delivered possession of all deposit tags he had received during the day to said teller. Thus it appears that it would have been possible for someone other than Draper to secure possession of both the money and the deposit tags in question. It was customary, Draper stated, for the tellers to occasionally assist each other in the manner in which said head night teller aided him. Upon quitting at midnight, Draper turned over his cash to said head night teller, who had previously assisted him. ■ The jury was the judge of Draper's credibility and any conflict in the evidence on material points must be deemed to have been resolved in his favor.

■ Draper's conduct following the alleged abstraction does not indicate a consciousness of guilt of having committed a crime so likely to be speedily discovered and to be attributed to him. He called at the bank on the day he was leaving, according to his testimony, and told several of the tellers good-by; he left his address with several and wrote to three upon reaching Canada and returning to the employ of the Bank of Montreal. According to Draper, the manager of the bank in Brantford informed him that he was wanted by the Pinkerton Detective Agency and that he was alleged to have embezzled from appellant. ■ Respondent sought to offer in evidence certain telegrams and a letter sent by him to appellant. There is some confusion in the record as to whether these telegrams were admitted by the court. They are treated by both parties as having been received in evidence and we will so regard them. We think they were evidence properly admissible, as the subject matter seems pertinent to the case. The first telegram was sent on November 23, 1921, and in it Draper stated that his address was 245 Malboro Street, Brantford, Canada, and that he emphatically denied the charges made. He also

requested the bank to wire and write him at once. Receiving no reply he telegraphed as follows on November 25th: "Unless matter is cleared immediately with Bank of Montreal, will enter action against you." On November 30th, the following message was sent: "Do you or do you not intend replying to my telegrams, you know the alternative." On January 3, 1922, he wrote the following letter:

"Brantford, Jan'y 3–22.

"Emanuel Cohen, Esq.,
"Hellman Bank,
"Los Angeles, California.

"Dear Sir:

"In view of the reply you made to the British American Bank, San Francisco, regarding your charges against me, would say, if you will fully clear my name with the general manager, Bank of Montreal, at once, I will withdraw any statements I have made against you and will promise not to proceed with any suit for libel or to take action of any kind.

"I have suffered six weeks' loss of work as well as damage to my business reputation through your willful, unbusinesslike course in not either pressing or withdrawing your charge.

"If you still refuse to straighten out this matter, I will take the only course left, coming to Los Angeles and entering action against you.

"Yours truly,
"C. M. Draper.

"245 Malboro St., Brantford, Ontario, Canada."

Although the bank received said telegrams and letter it never replied to Draper.

Appellant further argues that the alleged libelous communications were privileged, because made "without malice, to a person interested therein, by one who is also interested." (Sec. 47, subd. 3, Civ. Code.) Certain false communications, which are not privileged if volunteered, become privileged when made in response to an inquiry from a person having an interest in the subject matter of the communication. We are of the view that a false communication from one bank to another to the effect that an ex-employee of the former, then in the service of the latter, had unlawfully appropriated funds of his ex-employer is

of this class, and is not privileged unless made in response to an inquiry by the bank to which the communication is made. The relations between banks by reason of their geographical proximity and interchange of business may be such that a moral or social duty rests upon the communicant to impart the information, which renders the false and libelous communication privileged although volunteered, but no such relations were shown to exist between the Hellman Bank in Los Angeles and the Bank of Montreal in Canada in the instant case. Although the communication made in the telegram of November 22d was made after inquiry by the Bank of Montreal, the inquiry was not initiated by said Bank of Montreal, but was provoked by the Hellman Bank by the letter of November 16, 1921. If the purpose of said letter was legitimate, or one which the law will recognize as proper, the fact that the inquiry resulted therefrom and would not otherwise have been made, becomes immaterial and the communication is privileged; otherwise it stands upon the same footing as a volunteered communication and is not privileged. Appellant contends that the letter of November 16th is a mere request for information as to Draper's address. If the Hellman Bank did not have Draper's address it certainly was entitled to ascertain it and to locate him by all reasonable means. It would be difficult, if not impossible, for a bank to frame a letter asking another bank for information as to the location of a former employee, and requesting a reply by wire, which would not cause the recipient of the letter, if the person concerning whom information was sought was then in its employ, to inquire as to the reason for the request, with a view of ascertaining whether it was for any suspected wrongdoing. There was some evidence in the instant case, however, from the testimony of Emanuel Cohen, vice-president of appellant, which would warrant the jury in inferring that the bank had knowledge of the address to which Draper proposed to return in Canada at the time the letter of November 16th was written, although said evidence is somewhat equivocal. If appellant was in possession of said address it must have written the letter with some other motive than the purported one of ascertaining Draper's address. Said witness Cohen, the author of the letter, testified that he wrote it because he thought it would cause Draper to admit that he took the money and to pay it

back; that he then believed Draper guilty and was still of that opinion. The letter also brought into the inquiry a nationally known detective agency. The witness Briggs, who was the Los Angeles manager for the Pinkerton Detective Agency, after refreshing his recollection by looking at his records, stated that the agency was not employed until November 22d. The letter in which Cohen stated that the agency had been requested to locate Draper was written on November 16th. From a consideration of this witness' testimony as a whole it is to be inferred that appellant's officers had reason to believe that Draper had planned to return to the employ of the Bank of Montreal, or that said bank would have knowledge of his whereabouts, and that it was intended that Draper, through said bank, should be informed of the communication. We cannot uphold the method pursued by appellant to obtain repayment of the amount it suspected respondent had taken from it. ▇ If a letter purporting on its face to be a mere inquiry for an address, but actually written for the purpose outlined above, provokes an inquiry as to why the information is sought, and in reply thereto the author of the original letter makes the false and libelous statements, the communication stands upon the same footing as if it had been volunteered, and is not privileged unless a voluntary communication would have been privileged. We conclude, therefore, that appellant cannot avoid liability on the ground that the communications were privilged.

▇ We are further of the opinion that appellant cannot escape liability for the second communication, the telegram of November 22d, on the ground that it was a libel published without its consent or authorization. The witness Cohen testified that he instructed the Pinkerton Detective Agency in Los Angeles to inform the Bank of Montreal as to the reason for wishing to locate Draper. He claimed that he stated the facts as to the disappearance of the money and deposit slips to the representative of the detective agency and told him to communicate such facts to the Bank of Montreal through the San Francisco correspondent of said Bank of Montreal. It does not appear from the testimony of said witness that he directed the detective agency to charge Draper with actually having taken the money. Neither does the contrary directly appear. The principal is

liable for the agent's torts committed in the scope of his employment and in performing service on behalf of the principal even though in the commission of the unlawful act the agent violated the principal's express instructions or exceeded his authority. Appellant cannot avoid liability in the instant case under the claim that the Pinkerton Detective Agency acted as an independent contractor in sending the communication, for whose act it was not legally responsible unless it expressly and unequivocally authorized said agency to charge Draper with fraudulent misappropriation.

 A sufficient publication or communication of the defamatory statements must be proved in a libel suit, and it is the rule that the author of defamatory statements is not liable for a publication thereof where he neither authorized nor intended such publication to be made. In the instant case the Hellman Bank having directed the detective agency to communicate with the British American Bank in San Francisco, which was the correspondent of the Bank of Montreal, with the intention that said San Francisco bank should in turn communicate with the Bank of Montreal, and all steps in the transfer of the information from appellant to the Bank of Montreal having been taken in precisely the manner contemplated by appellant, appellant must be deemed in law responsible for the several publications of the defamatory matter which the transmission of the information involved. A publication of the libel took place not only when the San Francisco agent of the Pinkerton Detective Agency exhibited the message received from the Los Angeles agency to one Cotter, who was connected with the British American Bank, but also when the message sent by the British American Bank to the Montreal Bank was read by the officials of the Montreal Bank. Since a publication of the libel took place when officials of the Montreal Bank received and read the message, communications received at Montreal constituted original evidence and the court below did not err in admitting said communications in evidence over the objection that the best evidence was not being offered and that the message received at San Francisco by the Pinkerton agency there should have been introduced or its absence accounted for.

Appellant contends that it was not shown by competent evidence that the person exhibiting to Cotter at the British

American Bank the message received by the San Francisco detective agency from the Los Angeles agency was a duly authorized agent of the San Francisco branch of the detective agency for whose acts the Los Angeles agency and, in turn, the appellant was liable. No claim is made that the message was in fact exhibited to the British American Bank by a person without authority. We are of the view that it was sufficiently established upon the trial that the telegram sent by Briggs of the Los Angeles agency to the San Francisco branch of the agency was identical in content with the libelous communication published at Montreal. Briggs testified that the message was sent to one P. E. Geaque, manager of the San Francisco branch. Cotter of the British American Bank, to whom was exhibited the message which he copied and sent to Montreal, stated in his deposition, which constitutes part of the record herein, that a man whom he had never met before, and who represented himself to be P. E. Geaque, of the San Francisco Pinkerton Detective Agency, presented himself and exhibited the message. We do not deem it necessary that the individual who appeared before Cotter and represented himself to be P. E. Geaque, of the detective agency, should, under the circumstances of the instant case, have been present at the trial in order to be identified by the Pinkertons as P. E. Geaque, of their agency.

Appellant also contends that the case must be reversed because of certain allusions made by one of the attorneys for respondent in the course of his questioning of several witnesses to the fact that the head night teller, who had assisted respondent on the last day of respondent's employment when the money disappeared, had since been tried and convicted of embezzling funds belonging to the Hellman banking house and was serving a term of imprisonment in San Quentin at the time of the trial. Since proof of the truth of defamatory matter will exonerate the defendant in a libel action, evidence which tends to establish the truth of the charges made is admissible. Conversely, the plaintiff may offer proof which will rebut evidence tending to establish the truth of the libel. Where plaintiff is charged with having committed a criminal act, evidence that the act has been committed by another is relevant to establish the falsity of the charge that plaintiff is the guilty party. (8 Cal. Jur.

49; 1 Wigmore on Evidence, p. 367.) However, the introduction of such proof is to be governed by the appropriate rules of evidence. In any event remarks of counsel made in the course of propounding leading questions to witnesses are not evidence, although their effect upon the minds of the jurymen may, under some circumstances, be prejudicial to the opposing party. But in the instant case the judgment as it now stands cannot be attributed in any extent to said remarks. Even though said remarks had not been made, the evidence establishes as a matter of law the publication of the libel, defendant's responsibility therefor and a lack of privilege. Further, the burden of establishing the defense of truth rested upon appellant, and all the evidence legally admitted would be insufficient as a matter of law to sustain a finding that the charges were true. It follows that the only respect in which the said remarks of counsel could have influenced the jury to the prejudice of appellant was in the assessment of damages. However, all excessive damages not justified by facts legally admitted in evidence must be deemed to have been eliminated from the case by the reduction made by the trial court upon the denying of appellant's motion for a new trial.

▮▮▮ Appellant further contends that the court acted without right in reducing the total amount of damages awarded from $20,000 to $10,000. It is well settled in this state, although a contrary rule prevails in some jurisdictions, that it is within the power of the trial court, where it is of the view that the damages awarded by the jury are excessive, to require a remission of a portion of the verdict as a condition to the denying of a motion for a new trial, as was done in the instant case. (*Doolin* v. *Omnibus Cable Co.*, 125 Cal. 141 [57 Pac. 774]; *Zibbell* v. *Southern Pacific Co.*, 160 Cal. 237 [116 Pac. 513]; *Kinsey* v. *Wallace*, 36 Cal. 462; *Riley* v. *Davis*, 57 Cal. App. 477 [207 Pac. 699]; *Lynch* v. *Southern Pacific Co.*, 24 Cal. App. 108 [140 Pac. 298].) Here the jury awarded compensatory damages in the sum of $15,000 and exemplary damages in the sum of $5,000. ▮▮▮ The court upon denying the motion for a new trial required the reduction of the total sum from $20,000 to $10,000, without specifying whether the exemplary damages should be entirely eliminated and the compensatory damages reduced to $5,000 or the compensatory damages

reduced to $10,000, the exemplary damages remaining $5,000, or whether both compensatory and exemplary damages should be reduced. Appellant argues that the evidence will not sustain an award of exemplary damages in any amount whatsoever, for the reason that there is no proof of malice in fact, as distinguished from legal malice, proof of malice in fact being essential to an award of exemplary damages, and that it cannot be determined from the manner in which the court below made the reduction whether exemplary damages have been entirely eliminated. From these premises it argues that the case must be reversed. Conceding for the purpose of argument only that there was no sufficient showing of malice in fact, or actual ill will or animosity on the part of the appellant bank toward Draper personally to sustain an award of exemplary damages, we do not deem it necessary to reverse the case. The burden rests upon the appellant to show that error has been committed and that the error is sufficiently prejudicial to require a reversal. If there was insufficient proof of actual malice to sustain an award of exemplary damages, it must be presumed that the court acted in accordance with law and eliminated such damages entirely when it ordered the jury's verdict reduced in an amount greater than the exemplary damages, rather than that it permitted the award or any portion thereof to stand. Appellant might have objected in the court below to the manner in which the reduction was made and have required the court to specify the sums in which the two types of damages, compensatory and exemplary, were to be reduced, in which event any error of the court in not eliminating exemplary damages would have been made to appear. It does not appear that such a demand was made upon the trial court. This being the case, appellant must be deemed to have acquiesced in the court's action and to have lost the right to urge this objection upon appeal as a ground for reversal.

It is further argued that the court erred in permitting the witnesses David Wright and Mary Wright to testify as to Draper's good reputation. Said witnesses had known Draper in Brantford, Canada, for eight or nine years. Both testified, without going into detail, that his reputation in the community for truth, honesty and integrity was very good. It is the general rule in actions for

libel, that the plaintiff may not offer evidence of his good reputation except in rebuttal of evidence of bad reputation adduced by defendant, for the reason that the good reputation of the plaintiff is presumed until it is assailed by the defendant. (*Davis* v. *Hearst*, 160 Cal. 143 [116 Pac. 530].) An exception to this rule has been made where the injury alleged is to the plaintiff in his business or professional capacity. We deem it unnecessary to decide whether evidence of Draper's good reputation in the community, rather than among bankers, was admissible under this exception, for the reason that any error in admitting such testimony would not be sufficiently prejudicial to justify a reversal. The allegations of the complaint as to Draper's good reputation were denied in the answer. Since the basis of excluding the testimony is that it is superfluous, for the reason that good reputation is presumed, we would require a clear showing of prejudice before we would hold that evidence of facts that are presumed requires a reversal. Subsequent to the testimony of the Wrights, appellant offered evidence to impeach Draper's good reputation. The testimony of the Wrights would, in any event, have been admissible in rebuttal of such testimony. Its introduction before, rather than after, appellant had attacked plaintiff's reputation, could not have prejudiced appellant's rights to any material extent.

An examination of the other assignments of error made by appellant as to the admission of evidence and the giving or refusal of certain instructions reveals no error sufficiently prejudicial to warrant a reversal.

The judgment appealed from is affirmed.