[Civ. No. 3187. Second Appellate District, Division Two.—May 21, 1920.]

## F. D. JIMENO, Appellant, v. COMMONWEALTH HOME BUILDERS (a Corporation), et al., Respondents.

[1] LIBEL—WORDS ACTIONABLE PER SE—DAMAGE—PLEADING.—Words written or printed may be libelous and actionable *per se*, that is, actionable without any allegations of special damage, if they tend to expose the plaintiff to public hatred, contempt, ridicule, aversion, or disgrace, and to induce an evil opinion of him in the minds of right-thinking persons and deprive him of their friendly intercourse or society, even though the same words, if spoken, would not have been actionable.

[2] ID.—WHEN PUBLICATION LIBELOUS PER SE.—If, on its face, the publication is of a character that usually, ordinarily, and naturally detracts from the reputation and standing of the plaintiff, and tends proximately and naturally to deprive him of the confidence and esteem of others, thus causing him to be shunned or avoided, it is libelous *per se*, and special damages need not be alleged or proved. From such a publication the law presumes general damages as a natural and probable consequence.

[3] ID.—IMPUTATION OF DISHONEST PRACTICES.—A printed and published article which imputes to plaintiff grave and reprehensible misconduct—dishonest practices which, if established, would justly bring him into general contempt and disgrace—is libelous and actionable *per se*.

[4] ID.—CONSTRUCTION OF PUBLICATION—CONSIDERATION AS WHOLE.—The construction which it behooves a court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer.

[5] ID.—VIOLATION OF CONFIDENCE — TREACHERY TO ASSOCIATES — EFFECT OF WRITING.—A writing that charges another with violating a confidence that has been reposed in him or with treachery to his associates is actionable *per se*.

APPEAL from a judgment of the Superior Court of Los Angeles County. Grant Jackson, Judge. Reversed.

The facts are stated in the opinion of the court.

N. C. Folsom and Jesse A. Gyger for Appellant.

No appearance for Respondents.

FINLAYSON, P. J.—This is an action for libel. Defendants demurred to plaintiff's second amended complaint upon the grounds that it does not state a cause of action and that, in certain particulars, it is uncertain, ambiguous, and unintelligible. The demurrer was sustained. Plaintiff declined further to amend, and judgment for defendants was entered accordingly. From that judgment plaintiff appeals.

The extrinsic circumstances alleged in the complaint by way of inducement and to be considered in connection with the alleged libel are these: Plaintiff, an investment broker, dealing in real estate and mining investments, was, at all times mentioned in the complaint, a stockholder in the defendant corporation, Commonwealth Home Builders, and chairman of a committee of stockholders organized to investigate the affairs of that corporation and protect the rights and interests of all its stockholders. The investigating committee was organized at the instance of plaintiff, with the advice and assistance of one C. E. Norton, a reputable auditor. Prior to the publication complained of, plaintiff was a stockholder in, and had been active in the promotion of, the Stone Chief Mining Company, a corporation.

The complaint alleges that, for the purpose of exposing plaintiff to contempt, hatred, ridicule, and obloquy, defendants maliciously published and circulated in the "American Globe," a magazine, among the stockholders of the defendant corporation, of and concerning plaintiff, the following false and defamatory articles:

### "NORTON'S FILIBUSTER EXPEDITION ON COMMONWEATH HOME BUILDERS—A FIZZLE.

"C. E. Norton, President of Original Home Builders of Los Angeles, as well as trustee for a little more than half of the stock, also a director of the Southern California Home

Builders, in conjunction with Mr. Jimeno, an official and promoter of the Stone Chief Mining Co., and a stockholder of Commonwealth Home Builders, entertained some twenty-five stockholders of Commonwealth Home Builders, in the office of the Stone Chief Mining Co. on the evening of December 1, 1916. The editor of the American Globe received no notice of this happening, but did manage to secure just the information desired by stockholders who do not desire their wealthy corporation wrecked. . . . The little gathering seemed to be a cooked and dried affair. . . . As usual money was desired. It seems that the 4000 stockholders are to contribute on the assessment basis of so much per share (to these men) which has not the sanction of the present sane and responsible administration, and no statement rendered— no questions asked. An unauthorized bill for $150 was presented by Mr. Jimeno, of the Stone Chief Mining Co. . . . ''

## "PROTECTIVE SYSTEM OF RUINING STOCK-HOLDERS.

"Money greed will cause some people to do anything as long as they are able to keep out of jail. . . . The stockholder calls on a so-called auditor about whose antecedents no one knows anything, and whose record in corporation activities has never shown a clean winding up of affairs for stockholders of the other corporations concerned. The master brain (?) so steeped with greed for gold as to care nothing for the majority of stockholders' interests, whom he terms 'boobs' autocratically rises to the occasion. He maps out the campaign in such a manner as to prevent himself from being caught on conspiracy-to-wreck-corporation charges. 'This will cost you nothing. I will get you in control of that corporation and between you and me we ought to milk it for a long time.' 'But I do not understand the building and investment company business,' replies the stockholder. 'I have had some experience in oil, mining and wildcat schemes, though, if that would do any good.' Any office boy can do what you are to do, replied the self-styled auditor. . . . I will have another man look for certain information which we twist into such shape as to put the management of that building and investment company on the defensive. Anything to arouse suspicion and shatter confidence and the credit of the company. We don't care how many

business deals we knock out, thereby depriving the stockholders of future profits, neither do we care how much damage we may cause the company otherwise, or how much expense we put it to, all of which affects the assets of stockholders. . . . Stockholders who satisfy themselves about the character and former business records of such 'Money Greed Meddlers' and corporation wreckers . . . would hardly be inclined to give these 'Intolerance Individuals' their support, proxies or votes. They have nothing at stake. . . . Protective Committee (?) composed of so-called auditor and stockholder receive: (1) Contributions from stockholders to carry on campaign of wrecking their own company, of which no account is given and which could run into some thousands of dollars. . . . Fine business for the auditor and stockholder but rather coarse financiering.''

Respondents have not favored us with any printed points or authorities, and we are, therefore, somewhat in the dark as to the precise reasons for their attack upon the complaint. At the oral argument, their counsel contented themselves with the bare statement that nowhere in the complaint has plaintiff alleged any special damages. From this we infer that the chief, if not the only, ground relied upon by respondents, is the absence of an allegation of special damages. If, as we believe, the alleged defamatory publication is libelous *per se*, then no allegation of special damages is necessary. The courts have long recognized a distinction between written and oral defamation. While whatever charge will sustain a suit for slander when the words are merely spoken will sustain a suit for libel if they are written or printed and published, yet many charges which if merely spoken of another would not be actionable without proof of special damages will be libelous *per se* when written or printed and published. [1] Accordingly, it may be stated as a general proposition that words written or printed may be libelous and actionable *per se*, that is, actionable without any allegations of special damages, if they tend to expose the plaintiff to public hatred, contempt, ridicule, aversion, or disgrace, and to induce an evil opinion of him in the minds of right-thinking persons and deprive him of their friendly intercourse and society, even though the same words, if spoken, would not have been actionable. (25 Cyc. 250.) [2] If, on its face, the publication is of a character that usually,

ordinarily, and naturally detracts from the reputation and standing of the plaintiff, and tends proximately and naturally to deprive him of the confidence and esteem of others, thus causing him to be shunned or avoided, it is libelous *per se,* and special damages need not be alleged or proved. From such a publication the law presumes general damages as a natural and probable consequence.

Some of the defamatory language in the libelous articles published by defendants manifestly refers solely to the auditor, C. E. Norton. Other defamatory portions of the articles seem to be aimed at both plaintiff and Norton, as, for example, the reference to "money greed meddlers." Still other portions leave the reader, ignorant of the extrinsic facts, in doubt as to whether Norton or plaintiff is the one referred to. By no *colloquium* could the pleader make applicable to plaintiff those words that obviously apply to Norton only. As to all the other defamatory charges, the broad allegation that the matter in the articles was published of and concerning plaintiff is sufficient to permit proof that the readers who knew the extrinsic circumstances understood that the words referred to plaintiff. (Code Civ. Proc., sec. 460; *Harris* v. *Zanone,* 93 Cal. 59, [28 Pac. 845].)

[3] We think the article is libelous and is actionable *per se.* Our code defines libel as follows: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, sec. 45.) As said in *Tonini* v. *Cevasco,* 114 Cal. 272, [46 Pac. 105], this definition "is very broad, and includes almost any language which upon its face has a natural tendency to injure a man's reputation either generally or with respect to his occupation."

If, as alleged, the defamatory matters were printed and published of and concerning plaintiff, no unprejudiced person of ordinary intelligence, reading the publication, could avoid the conclusion that it imputed to him grave and reprehensible misconduct—dishonest practices which, if established, would justly bring him into general contempt and disgrace. Upon its face, the language charged, if published of and concerning plaintiff, tended naturally, necessarily,

and proximately to produce some, at least, of the results mentioned in section 45 of the Civil Code.

[4]   To test its libelous quality a publication must be considered as a whole.  "The construction which it behooves a court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer."  (*Cooper* v. *Greeley*, 1 Denio (N. Y.), 359.)   Thus in the case cited, the charge was not "made in an open and direct manner," "but," it was said by the court, "an imputation made in that form is not the less actionable."   In our opinion the *innuendoes*, as alleged in the complaint in this case, affix to the words their true meaning.   It is alleged, by way of *innuendo*, that the language of the publication was intended to mean, and that the persons who read it understood it to mean, that "plaintiff had been connected with wildcat or fraudulent schemes in the past, and that plaintiff would 'do anything' so long as he should be 'able to keep out of jail'; that he had conspired with another to obtain information concerning the corporation Commonwealth Home Builders, and 'twist' such information into such shape as to rouse suspicion and shatter confidence and the credit of the company and to decrease the assets thereof for the purpose of obtaining a profit for himself, and that said plaintiff and one other are 'money greed meddlers and corporation wreckers'; that the plaintiff was attempting to get on a 'big pay roll,' and that the plaintiff was attempting unconscientious and 'coarse financiering.' "   We think the language of the articles warrants the construction thus put upon it by plaintiff, and that the effect of the publication was to expose plaintiff to "obloquy," which is defined by Webster as "blame; reprehension."   Surely no intelligent person could read this publication without understanding that it was meant to charge that plaintiff is not an honorable man—that he is a person who had been guilty of such reprehensible misconduct, as should deter others from trusting him.   As chairman of a stockholders' investigating committee, organized for the purpose of protecting the rights and interests of the stockholders of the defendant corporation, plaintiff held an important position of trust and confidence that demanded of him the exercise of the utmost good faith.   And yet, if the charges be true, he has grossly

violated that trust and treacherously betrayed the confidence of those whose interests it was his duty to protect. Such an implication of lack of integrity is unquestionably actionable *per se.* [5] A writing that charges another with violating a confidence that has been reposed in him or with treachery to his associates is actionable *per se.* (18 Am. & Eng. Ency. of Law, 2d ed., 912.)

In our opinion the complaint states a cause of action; and, as we see nothing in it that is ambiguous, uncertain, or unintelligible, we think it was not demurrable upon any of the grounds set forth in the special demurrer.

The judgment is reversed and cause remanded, with directions to overrule the demurrer.

Thomas, J., and Weller, J., concurred.