[L. A. No. 10585. In Bank.—August 19, 1931.]

ROSALIND BATES, Appellant, v. KEMPER CAMPBELL, Respondent.

Rosalind Goodrich Bates, *in pro. per.*, for Appellant.

W. Joseph Ford, Meserve, Mumper, Hughes & Robertson and Anderson & Anderson for Respondent.

THE COURT.—Plaintiff brought this action to recover damages from the defendant for an alleged libel. A demurrer to the first amended complaint was sustained without leave to amend. Judgment for costs was thereupon entered for the defendant, from which judgment this appeal was taken.

It is alleged in the complaint that the plaintiff was, and is, what is generally known and termed a "publicity agent"; that by her perseverance, endeavors and ability she had created and built up a lucrative business as such publicity agent; that on or about October 31, 1927, the defendant, an attorney at law, and then president of the Los Angeles Bar Association, and a man of great wealth and influence, wrote, published and caused to be published by others, a certain letter or article of and concerning the plaintiff, which said letter or article reads as follows: "Referring to certain letter appearing in a morning paper of this date. Without taking the time to comment upon the entire letter of Mr. McNitt, I desire to correct one or two misstatements therein

contained. These misstatements were perhaps due to the stress under which Mr. McNitt is apparently laboring in his campaign for election to the Board of Governors of The State Bar. I did not as stated by Mr. McNitt, nor did my office send 'to the metropolitan dailies publicity containing statements which were erroneous'. No publicity whatever was sent out from my office or by me concerning the election, which fact Mr. McNitt could have ascertained by the slightest inquiry.

"I did not ask Mr. McNitt to withdraw although I did consider it my duty as a long time acquaintance and as a member of the State Bar Commission to ask him whether he had considered the fact that as a member of the Board, if elected, it would be his duty to establish standards for admission which might conflict with the policy of the law school with which he is connected, this being a duty which cannot be delegated to a committee. In the course of the conversation, he stated he did not like to be in the position of running against leaders of the Bar, such as Mr. Hunsaker and Mr. James and he thought he would withdraw. Later on he informed me that he had been importuned by his friends to stay in the race.

"As to the principal subject of controversy to which the letters of Judge Hollzer, Miss Bates, Mr. McNitt, and Mr. Hunter, are directed, I think this could have been avoided, had there not been confusion with respect to the fact and date of termination of employment of Miss Bates by the Los Angeles Bar Association. This confusion is apparently cleared up by the publication of those letters. It would probably serve no useful purpose to recite the circumstances leading to the request for Miss Bates' resignation which in pursuance to such request, was received and accepted by the Board of Trustees on or about July 7, 1927. The confusion, however, is easily understood in view of the fact that Miss Bates without permission or consent continued to use Bar Association stationery and failed to notify the metropolitan papers of her change of status and in using her articles it was assumed that she still represented the bar association. In fact, not only Judge Hollzer, but a number of other judges and lawyers who signed certain petitions and letters at the request of Miss Bates have stated that they would not have done so had they known she was not employed by

the Bar Association and had they known that certain other candidates were in the field.

"October 13, 1927.                    KEMPER CAMPBELL";

that by said letter or article the defendant intended it to be understood, and it was so understood by the readers thereof, to mean that plaintiff had been discharged by the board of trustees of the Los Angeles Bar Association for the reason that she was not a fit person to occupy such position; that she had appropriated to her own use, and had used, property of said bar association by reason of which conduct and the employment of false pretenses she had induced divers persons to sign certain petitions and letters which they would not otherwise have signed; that to the defendant's knowledge all of said statements were false, defamatory and untrue; that said letter or article is false, libelous, defamatory, untrue and unprivileged, and was written and published maliciously and with evil intent to injure and defame plaintiff and to destroy her business and to prevent plaintiff from earning a livelihood for herself and minor children; that said false and defamatory letter or article has greatly injured the reputation of plaintiff in the city of Los Angeles and the county of Los Angeles, and has exposed her to public hatred, contempt, ridicule and obloquy, and has injured her in her profession, all to her damage in the sum of $50,000. The complaint also prays for an award of exemplary or punitive damages in a like amount.

Section 45 of the Civil Code defines libel as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation". The code definition of libel is very broad and has been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation. (*Schomberg* v. *Walker*, 132 Cal. 224 [64 Pac. 290]; *Stevens* v. *Snow*, 191 Cal. 58, 62 [214 Pac. 968]; *Tonini* v. *Cevasco*, 114 Cal. 266, 272 [46 Pac. 103].) In the determination of this question, the alleged libelous publication is to be construed "as well from the expressions used, as from the whole scope and apparent object of the writer". (*Stevens* v. *Storke*, 191 Cal. 329, 334

[216 Pac. 371, 373]; *Bettner* v. *Holt,* 70 Cal. 270 [11 Pac. 713, 715].) The case last above cited states that "not only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning under all the circumstances attending the publication which such language may fairly be presumed to have conveyed to those to whom it was published. So that in such cases the language is uniformly to be regarded with what has been its effect, actual or presumed, and its sense is to be arrived at with the help of the cause and occasion of its publication. And in passing upon the sufficiency of such language as stating a cause of action, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of a complaint for libelous publication according to its natural and popular construction". That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader. A defendant is liable for what is insinuated, as well as for what is stated explicitly. (*Schomberg* v. *Walker, supra,* p. 227.)

▮ Publications falling within the statutory definition above set out are libelous *per se,* thus obviating the necessity for an averment of special damage. (*Layne* v. *Kirby,* 208 Cal. 694, 696 [284 Pac. 441].) Should the alleged libelous publication be ambiguous and susceptible of two meanings, one of them harmless and the other injurious, it is necessary for the plaintiff to plead by innuendo the facts upon which he relies to point out the injurious meaning of the writing. (*Mellen* v. *Times-Mirror Co.,* 167 Cal. 587 [Ann. Cas. 1915C, 766, 140 Pac. 277]; *Ousdal* v. *Sansum,* 86 Cal. App. 119, 122 [260 Pac. 322]; *Vedovi* v. *Watson & Taylor,* 104 Cal. App. 80, 84 [285 Pac. 418].) However, it is not the purpose of an innuendo to "beget an action", and the meaning of the language complained of may not be enlarged or extended thereby. (*Chavez* v. *Times-Mirror Co.,* 185 Cal. 20, 25 [195 Pac. 666]; *Grand* v. *Dreyfus,* 122 Cal. 58, 61 [54 Pac. 389]; *Hearne* v. *De Young,* 119 Cal. 670 [52 Pac. 150]; *Des Granges* v. *Crall,* 27 Cal. App. 313, 315 [149 Pac. 777].) In other words, it is

the office of the innuendo to merely explain or interpret, without enlarging, the alleged libelous publication.

■ Viewing the alleged libelous communication in the light of these well-established principles of law, we are of opinion that there is merit in respondent's contention that the innuendo contained in the complaint attempts, in some particulars at least, to enlarge and extend beyond its fair and reasonable import the meaning of certain of the statements published of and concerning the appellant. To illustrate: The statement in the letter that "It would probably serve no useful purpose to recite the circumstances leading to the request for Miss Bates' resignation which in pursuance to such request, was received and accepted by the Board of Trustees on or about July 7, 1927," may not be construed, as in the complaint here, to mean that "plaintiff was discharged by the Board of Trustees of the Los Angeles Bar Association for the reason that she was not a fit person to occupy such position". The statement quoted from the letter makes no reference whatever, either expressly or impliedly, to appellant's fitness or unfitness to occupy such position, and is not therefore reasonably open to the construction attempted to be placed on it. (*Maynard* v. *Fireman's Fund Ins. Co.*, 47 Cal. 207, 208; Id., 34 Cal. 48 [91 Am. Dec. 672].) This sufficiently illustrates the point as to the office of an innuendo. In view of our conclusion to be presently announced, we deem it unnecessary to determine whether other allegations of the complaint also attempt to improperly extend and enlarge the alleged libelous publication.

■ Considering the publication herein as well from the expressions used as from the whole scope and apparent object of the writer, we are of the view that certain of respondent's written statements of and concerning the appellant are actionable entirely regardless of the innuendoes by which it is sought to explain or enlarge their sense. This being so, the allegations by way of innuendo may be disregarded as surplusage. The publication here complained of charges, among other things, that "Miss Bates without permission or consent continued to use Bar Association stationery and failed to notify the metropolitan papers of her change of status and in using her articles it was assumed that she still represented the Bar Association. In fact, not

only Judge Hollzer, but a number of other judges and lawyers who signed certain petitions and letters at the request of Miss Bates have stated that they would not have done so had they known she was not employed by the Bar Association and had they known that certain other candidates were in the field.'' It is this portion of respondent's letter that contains the sting of the libel. In this connection, it must be borne in mind that the complaint alleges and for present purposes it must be taken to be true, that appellant for some time prior to the publication of the alleged libel had been engaged as a publicity agent, and by means of her ability as such had created and built up a lucrative business. There can be but little doubt that a publicity agent, like any other agent, stands in a fiduciary relation to his principal, and because of the trust and confidence reposed in him by his principal he must exercise the utmost good faith, must acquire no interest adverse to that of his principal, and must not unite his personal and representative capacities. As an incident to his employment, a publicity agent is necessarily entrusted with certain intimate information, files, letter-heads, and other property of his principal essential and expedient to the proper and satisfactory discharge of his duties. To state of such a fiduciary that, without having first obtained the ''permission or consent'' of his principal, he had ''continued to use'' these instrumentalities subsequent to the termination of his employment, is to injure him in his occupation within the meaning of section 45, *supra*. It is only reasonable to conclude therefrom that other persons contemplating the employment of such a faithless servant, upon hearing of this charge, would hesitate, and in all probability would decline, to contract for his services because of the possible consequences. Surely no one can read the respondent's letter without understanding it to mean that plaintiff had been guilty of reprehensible conduct that would deter people from trusting her in her occupation.

While, as contended by respondent, it may not be libelous to state that appellant had failed to notify the newspapers of her change of status (it not being incumbent upon her to do so), and likewise, while it may not be libelous to state that the newspapers, being ignorant of appellant's change of status, had assumed that her articles were still

being written for and on behalf of the Los Angeles Bar Association (appellant not being answerable for the construction placed on such articles by the newspapers), the fact still remains that respondent wrote and published of the appellant that subsequent to the severance of her confidential connection with the Los Angeles Bar Association, and without its permission or consent, she had continued to use bar association stationery, with the result that certain persons, thinking appellant still in the employ of the bar association, were so deceived or misled as to have performed certain acts and done certain things which they would not have performed or done had they been accurately advised as to appellant's status. That respondent's letter charges, both expressly and by necessary implication, that appellant had been guilty of a flagrant violation of the confidence and trust reposed in her by the bar association when it employed her, and that such charge of unethical conduct would have a "tendency to injure" appellant in her occupation, goes without saying.

In *Swan* v. *Thompson*, 124 Cal. 193, 198 [56 Pac. 878, 880], a slander case, a charge that a "master mariner is in the habit of getting drunk" is said to be sufficiently broad to cover his conduct upon his voyages, as well as between his voyages, upon the sea as well as upon the land. The opinion declares: "We can imagine no language better calculated to ruin a master mariner than the language here used. . . . No man of the slightest business prudence would employ such a master mariner to navigate his ship." This language, paraphrased to fit the present case, would read: "No man of the slightest business prudence would employ as his publicity agent one who subsequent to the termination of such employment, and 'without permission or consent', and to the confusion and possible deception of third persons, would continue to use for his own private and personal ends, letter-heads or other property of his principal entrusted to him solely for the purpose of effecting the satisfactory discharge of his duties as such publicity agent."

Moreover, and aside from any "tendency" of the charge to injure appellant in her occupation, respondent's letter charges appellant with having been guilty of conduct which is calculated to and undoubtedly did expose her to obloquy, as one untrue to a trust reposed in her by a former em-

446

ployer, and, if the charge is false, it is libelous under section 45, *supra.* To expose one to obloquy is to expose him to censure, reproach, blame or reprehension, for the terms are synonymous. (*Stevens* v. *Snow, supra,* p. 62; *Tonini* v. *Cevasco, supra,* p. 273; *Bettner* v. *Holt, supra,* p. 275.)

The complaint is therefore immune from general demurrer on either of the foregoing theories. As the truth or privileged character of the charges directed at appellant are purely matters of defense, we need not consider them upon this appeal from a judgment entered upon the sustaining of a demurrer to the first amended complaint. We cannot agree that the complaint, on its face, shows the publication to have been a privileged one. While the parties in their briefs concern themselves solely with the general demurrer, we have also considered the several grounds of special demurrer, and likewise find them not to be well taken.

The judgment is reversed, with direction to the court below to overrule the demurrer and permit the defendant to answer, should he be so advised.