[Civ. No. 6509. Fourth Dist. May 8, 1961.]

JOAQUIN J. CORREIA, Appellant, v. JOAQUIN ENOS SANTOS et al., Respondents.

Fredricks & Sullivan and Warren Sullivan for Appellant.

Louis L. LaRose, Berryhill & Kuney and John R. Berryhill for Respondents.

COUGHLIN, J.—This is an appeal from a judgment of dismissal after failure to amend upon entry of an order sustaining the defendants' demurrers to the plaintiff's fourth amended complaint in an action for slander.

The primary issue on appeal is whether certain allegedly slanderous words are actionable *per se*.

On June 1, 1958, the plaintiff Correia, who is the appellant herein, and the defendant Santos, who is one of the respond-

ents herein, were rival broadcasters over competing radio stations. At this time the plaintiff also was president of a nonprofit corporation known as the ''T.D.E.S. Association of Tulare County, California.'' On the aforesaid date, the defendant Santos conducted a radio broadcast over Station KCOK, wherein the plaintiff Correia was referred to as ''Mr. President'' and in which Santos stated in substance,[1]

[1]The following is a verbatim transcript of the statements made by Santos in this broadcast:

''Now, my friends, briefly let's have our morning cocktail, the morning bug killer, which is an answer that is necessary.

''Some people have asked me what's the reason why I am announcing the festivities of the Holy Ghost Celebrations of different localities in the San Joaquin Valley and not announcing the celebration in Tulare. In reply, I must say that I am not authorized to do so.

''The Festivity of the Divine Holy Ghost, that takes place under the auspices of the 'T.D.E.S. Association,' of which I am proud to be a member, has been announced in my program since 1937; since my very first broadcast. This decision, by the committee taken this year, I am led to understand, was done only to obey the orders and false statements of the president of the same lodge.

''In such a festivity, being in honor of the Divine Holy Spirit, this following the traditions of the Azorian people, it is surprising that there is someone who takes advantage of such an occasion to make room for his rancorous hatred and to take revenge upon one who is superior to him, not in wealth but in actions and conduct.

''It is surprising that, amongst a group of good men, all heads of good families, where the culture of friendship and love should be greatest, which is the best act that can be practiced in all corners of the earth, there exists one who spoils the group. But there is an old saying that says: 'Amongst a flock of white sheep there is always a black one to spoil the flock.'

''There always were, and always will be, unscrupulous men who, to gain sympathy and support from those by whom he is yet unknown, makes them fantastic promises with lies and hypocracies, thus diverting the public attention.

''It is in our public relations that our virtues or defects are more clearly manifested. When the vanity of power drives one to insanity, he stops being what he used to be and becomes another person with different qualities, even running the risk of changing his character. Vanity and snobbism has changed many persons. Mr. President is one of those gentlemen. He, at first sight, appears to be an excellent person but who changed immediately after he was taken in and appointed as an officer, taking part on various committees of such organizations; organizations in which others worked hard in the past and organized at the cost of dollars, sacrifice and many hours of hard work. In the shade of these organizations are those who have done nothing. They are parasites that, in the Portuguese understanding, is a louse; germs which only produce lice, or brings an itch to the scalp of those who have it. Today they sit as great among the great. As they are appointed and become proud, snobbish and vain, they become insane in command. The attitude of 'I want,' 'I can,' 'I command,' to be done this way or that way goes to their head, and he is driven to insanity, and he is irresponsible in his action. He performs irregularities at any time, even interfering in the life of others and forgetting what help these others had given him before. But the blame for these acts of shame to us and to our colony, as I already said, is in the ones who let him reach this point, and more so,

that he did not broadcast an announcement concerning an activity of the Tulare "T.D.E.S. Association" because he was not authorized to do so and that the decision of the committee in this regard was taken to "obey the orders and false statements" of the president of that lodge who is acting out of "rancorous hatred and to take revenge." As a part of this broadcast the defendant inferred that the plaintiff was an unscrupulous person who, in order to gain support from those who did not know him, made "fantastic promises with lies and hypocracies"; stated that the plaintiff was one of those persons whose "vanity of power" drives them to "insanity"; that "vanity and snobbism" had changed his character; that at first he appeared to be an excellent person but changed when he became an officer; likened the plaintiff to those who are parasites, who do nothing, who become "insane in command," and whose authority drives them to "insanity"; stated that these things caused the plaintiff to be irresponsible in his actions; that such people are "unable

the ones who nominated him to executive positions. Once nominated, these creatures are like horses, which, when they get the bridle in their teeth, the rider is unable to control them. These creatures should be kept away from our public affairs because they are unable to assume responsibility and direction of groups which should work for the good name and progress of our people and our organization.

"The old proverb, 'If you want to know who the villain is, give him the stick of power,' is very true. The truth of that popular proverb cannot be contradicted.

"It certainly hurts to get ingratitude as payment of the good that I did to Mr. President at the time that he arrived at my door carrying his accordion on his back, without financial resources with which to buy a loaf of bread or a package of cigarettes.

"I did, and I believe that on top of the Calvary, comfort and moral lessons were written with precious blood better than men. They insulted Christ, and He kept silent; they drove thorns into Him, and He smiled with love to the executioners; they atrociously tore His flesh. Amongst screams, hatred and curses, with His blood running from His wounds, He fell over the hangman with a blessing. In exchange for their highest act of cruelty, His lips only spoke to His Father, the most humble and divine prayer that could come from His lips for such a sacrifice: 'Father, forgive them, for they do not know what they are doing.'

"My friends, I have explained this in order to elucidate the public, who is not familiar with this case and probably are saying that I have refused. I must say it is not true, and it is a lie that I have refused to announce the Fiesta which I have announced for 21 years, and all of the Fiestas of the Portuguese colony all over the State of California. If they say that my price is too high, all that is not true.

"This is my explanation for the moment."

The membership of the "Association" consisted of Portuguese-speaking people; the broadcast was in the Portuguese language; and the foregoing transcript is a translation of the broadcast attached to the complaint as an exhibit.

to assume responsibility"; that the proverb " 'If you want to know who the villain is, give him the stick of power' is very true"; and that the blame for "these acts of shame" is upon the people who nominated such a person to executive positions.

In his fourth amended complaint, the plaintiff attempts to allege three causes of action. All of them are against the respondent Santos, the respondent corporation KCOK, which operates the radio station over which the objectionable broadcast was made, and the respondent Munger, who is an officer and manager of that corporation. The first cause of action alleges that the broadcast was slanderous; that the plaintiff was engaged in the occupation and profession of radio announcer and commentator; and that he was damaged in the sum of $100,000. The second cause of action was similar to the first except that it omitted the allegation respecting the plaintiff's occupation and in lieu thereof alleged that he was president of the "T.D.E.S. Association of Tulare County, California, a nonprofit corporation." Each of these causes of action contained other appropriate allegations essential to the statement of a cause of action for slander, including those respecting malice, as to agency, and a demand for correction, but did not contain any allegation of special damage. It is apparent that the pleader thereof is relying upon a contention that the spoken words were slanderous *per se*. The third cause of action purports to be based on negligence; incorporates all of the allegations in the first two causes of action; and adds allegations respecting a failure to exercise reasonable care to control the type of broadcast made over the radio station in question.

General and special demurrers to each cause of action in this fourth amended complaint were filed by the defendants; the trial court sustained the general demurrers thereto on the ground that the broadcast was not slanderous *per se* and gave the plaintiff leave to amend; the plaintiff preferred to stand upon his complaint and did not amend; and the judgment of dismissal followed.

 False and unprivileged communications by radio which tend directly to injure a person "in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a

natural tendency to lessen its profits," give rise to a cause of action for slander *per se.* (Civ. Code, § 46, subd. 3.)

The term *"per se"* when used in describing the effect of allegedly slanderous words means that the utterance of such words is actionable without proof of special damage. (*Tonini* v. *Cevasco,* 114 Cal. 266, 270 [46 P. 103] ; *Rosenberg* v. *J. C. Penney Co.,* 30 Cal.App.2d 609, 619 [86 P.2d 696] ; *Jimeno* v. *Commonwealth Home Builders,* 47 Cal.App. 660, 663 [191 P. 64].) When the alleged slander occurs through a radio broadcast and the words are actionable *per se* it is assumed that the subject of the slander was damaged by the making of the broadcast. The plaintiff does not contend that the first and second causes of action in his fourth amended complaint contain any allegations of special damages. Therefore, the issue presented by this appeal with respect to these causes of action is whether the broadcast was slanderous within the provisions of the law heretofore set forth.

Preliminarily it is appropriate to refer to certain applicable general principles. In determining whether or not a radio communication is slanderous, the subject broadcast must be considered in its entirety (*MacLeod* v. *Tribune Publishing Co.,* 52 Cal.2d 536, 546-547 [343 P.2d 36] ; *Bates* v. *Campbell,* 213 Cal. 438, 441-442 [2 P.2d 383] ; *Stevens* v. *Storke,* 191 Cal. 329, 334 [216 P. 371] ; *Rosenberg* v. *J. C. Penney Co., supra,* 30 Cal.App.2d 609, 619; *Jimeno* v. *Commonwealth Home Builders, supra,* 47 Cal.App. 660, 663) ; "may not be divided into segments and each portion treated as a separate unit" (*Stevens* v. *Storke, supra,* 191 Cal. 329, 334; *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 546; *Bates* v. *Campbell, supra,* 213 Cal. 438, 441) ; "is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average" listener (*Bates* v. *Campbell, supra,* 213 Cal. 438, 442; *Semple* v. *Andrews,* 27 Cal.App.2d 228, 233 [81 P.2d 203] ) ; should not involve a "hair-splitting analysis of language" (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 550) ; must be construed not only from the expressions used but " '*from the whole scope and apparent object*' " of the person making the statement (*Stevens* v. *Storke, supra,* 191 Cal. 329, 334) ; and "not only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning under all the circumstances attending the publi-

cation which such language may fairly be presumed to have conveyed to those to whom it was published'' (*Bettner* v. *Holt,* 70 Cal. 270, 274 [11 P. 713]; *Bates* v. *Campbell, supra,* 213 Cal. 438, 442; *Semple* v. *Andrews, supra,* 27 Cal.App.2d 228, 232).

The effect of the distinction between libel and slander, i.e., written and oral defamation, is observed primarily in determinations as to whether particular language is actionable *per se* or requires the pleading of special damages; and it has been noted that ''many charges which if merely spoken of another would not be actionable without proof of special damages will be libelous *per se* when written or printed and published.'' (*Jimeno* v. *Commonwealth Home Builders, supra,* 47 Cal.App. 660, 663; *Tonini* v. *Cevasco, supra,* 114 Cal. 266, 271.) Nevertheless, decisions in libel cases are of assistance when considering the defamatory effect of allegedly slanderous language.

In the area under consideration, to be actionable *per se,* a defamatory statement must tend ''directly'' to injure the person defamed in respect to his office, profession, trade or business, in either of two ways, i.e., ''by imputing to him *general disqualification* in those respects which the office or other occupation *peculiarly requires,*'' or ''by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits.'' (Civ. Code, § 46, subd. 3.) (Emphasis added.)

There is nothing in the radio broadcast under consideration which ''tends directly'' (Civ. Code, § 46, subd. 3) to injure the plaintiff in his occupation as a radio announcer and commentator, nor is there anything therein which imputes to him general disqualification in those respects which such an occupation *peculiarly* requires. The plaintiff contends that the language used accused him of making false statements and of being a liar; that a reputation for truth and honesty is a peculiar requirement of his occupation; and that the defamatory statements imputed to him a general disqualification in this regard. Considering the alleged defamatory broadcast as a whole it is obvious that the broadcaster was commenting on the characteristics of the plaintiff as president of the ''T.D.E.S. Association''; the scope and object of the defendant's remarks clearly were confined to this area; there is no reference to the plaintiff's radio occupation; nothing was said about the falsity of any broadcasts made by him; nor did the objectionable statements refer to his general reputa-

tion for truth and honesty. An acceptable statement of the general principles applicable to the situation at bar, supported by substantial authorities, is set forth in 53 Corpus Juris Secundum, page 78, as follows:

"The rule is that, in order to render language concerning one in a special character or relation actionable, it must touch him in that special character or relation. The words must have such a close reference to such relation or character that it can be said that they are defamatory by means of an imputation on one in that character, distinct from, and independent of, an imputation on him as an individual. In order to be actionable it is not sufficient that the words be merely injurious to one whatever his pursuit, but they must prejudice him in the special profession or business in which he is actually engaged."

Except as the comments in question were directed to the plaintiff as president of the "Association," they were condemnatory of him as an individual rather than as a person engaged in a particular occupation; related to characteristics required in all pursuits of life and not peculiarly required of a radio announcer; and were not of that nature which would tend directly to injure him in his occupation as such announcer. (*Rea* v. *Wood*, 105 Cal. 314, 320 [38 P. 899].)

The plaintiff claims that the statements in the broadcast referring to insanity charged him with being an insane person. When these statements are considered as a part of the whole broadcast and are given the meaning which would be attributed to them by the average listener, it is apparent that the object of the broadcaster was not to describe the plaintiff as a person who was mentally ill but as one who was unreasonable in his actions and his demands. The meaning which the plaintiff would give to these statements, under the circumstances, is not acceptable.

For the reasons noted, the first count of the complaint did not state a cause of action for slander *per se* and the order of the court sustaining the general demurrer thereto was proper.

On the other hand the broadcast in question is reasonably susceptible of interpretation imputing to the plaintiff general disqualification in several respects which the office of president of the "T.D.E.S. Association" peculiarly required. Whether an oral statement is susceptible of a slanderous interpretation is a question for the court although

the issue as to whether it was so understood is a question for the trier of fact. (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 546.) ▮ On demurrer, that interpretation which will support the complaint must be accepted. ▮ Proceeding upon this basis, it appears that the defendant accused the plaintiff of obtaining committee decision by making false statements; with using his office to obtain revenge; as being the black sheep in an association which was dedicated to friendship and love; with unscrupulously obtaining support from its members by the use of ''lies and hypocracies''; with a desire for power which has caused him to act without reason; as being a person who was a parasite in the organization; who did nothing, but who became president and whose authority as such caused him to become ''proud, snobbish and vain,'' ''insane in command'' and ''irresponsible''; and that he was a person ''unable to assume responsibility and direction of groups which should work for the good name and progress of our people and our organization.'' It would be difficult to imagine what further might have been said to establish the general disqualification of the plaintiff for the office he held. (*Fitzgerald* v. *Piette,* 180 Wis. 625 [193 N.W. 86]; see also *Washer* v. *Bank of America,* 21 Cal.2d 822, 828 [136 P.2d 297, 155 A.L.R. 1338]; *Locke* v. *Mitchell,* 7 Cal.2d 599, 601 [61 P.2d 922]; *Larive* v. *Willitt,* 154 Cal.App.2d 140 [315 P.2d 732]; *Semple* v. *Andrews, supra,* 27 Cal.App.2d 228, 235.) To leave no doubt respecting the object of his charge the defendant's message laid ''the blame for these acts of shame'' upon the members of the organization, and inferred that their nomination and selection of the plaintiff as president constituted their big mistake.

▮ The defendant contends that the office of president of a nonprofit corporation is not an office contemplated by Civil Code, section 46, subdivision 3. Particular attention is directed to the provision therein which refers to the tendency of a defamatory statement to lessen the profits of an office, and it is argued that the use of such language, of necessity, limits the office considered to one for profit. However, this provision is an alternate designation of the manner by which a defamatory statement may tend to injure a person in his office, i.e., either (1) by imputing to him general disqualification in those respects which the office peculiarly requires *or* (2) by imputing something with reference to his office

that has a natural tendency to lessen its profits. Although no injury can arise from a defamatory statement imputing something with reference to a person's office which has a natural tendency to lessen its profits unless the office is one for profit, an injury may arise from such a defamatory statement which imputes to the office holder a general disqualification in those respects which the office peculiarly requires even though the office is not one for profit.

In *Jarman* v. *Rea*, 137 Cal. 339, 343 [70 P. 216], the court said: "It seems to be a well-settled rule both in England and in this country that words imputing a want of integrity in any one holding an office of confidence or trust whether an office of profit or not, are actionable *per se.*"

The actionable *per se* status prescribed by the statute applies to defamatory statements directed to the holder of a private office as well as the holder of a public office (*Frolich* v. *McKiernan*, 84 Cal. 177, 180 [24 P. 114]) and, in view of the fact that the existing distinction between written and oral acts of defamation is artificial (see Prosser on Torts [2d ed.], pp. 585, 595), no motivating reason exists for limiting the actionable *per se* rule to an office for profit. (*Fitzgerald* v. *Piette, supra*, 180 Wis. 625 [193 N.W. 86]; see also *Doherty* v. *Lynett*, 155 F. 681, 682.) We conclude that the order of the trial court sustaining defendants' general demurrer to the second cause of action was error.

 The third cause of action, which purports to be based on a negligence theory, incorporates all of the allegations of the first and second causes of action and further alleges that the radio station and its manager negligently failed to exercise control over the broadcast of their employee Santos, and that as a result of this negligence the plaintiff suffered damage. The allegations in the first and second causes of action allege that the broadcast in question was conducted by Santos as an agent for and in the course of his employment by the radio station and its manager. Under these circumstances, the latter are chargeable with any defamation that occurred and with any actionable injury resulting therefrom. (*Draper* v. *Hellman Commercial T. & S. Bank*, 203 Cal. 26, 38 [263 P. 240]; *Rosenberg* v. *J. C. Penney Co., supra*, 30 Cal.App.2d 609, 623.) The allegation that they also are liable for injury arising from that defamation because of their negligence, adds nothing to the cause of action. It would appear that the plaintiff bases this cause of action upon the provisions of section 48.5 of the Civil Code,

which, in substance, provide that the owner of a radio station, or his agent, is not liable for damages resulting from a defamatory statement made as a part of a broadcast over that station which was made by someone other than the owner or agent if the owner or agent exercised due care to prevent the utterance of such statement. By its own language this code section, at the most, confers a defense upon the owner and agent under the circumstances noted and does not raise a cause of action against them in favor of the person defamed. How these provisions support the plaintiff's contention is not made clear. At any rate, the owner and agent in the case at bar caused and made the broadcast objected to, and the inapplicability of the code section seems obvious.

However, the plaintiff argues that the third cause of action is based on a charge of defamation resulting in actual damage; that the damages therein alleged are not general but special; and whether or not the defamatory broadcast was slanderous *per se* is not determinative of the issue presented by the general demurrer. The allegations of damage relied upon refer solely to damage to the plaintiff's reputation, i.e., "reputation as a radio announcer and commentator, in his corporate office as president . . ., and to his reputation in general." In regard to actions for libel and slander, section 48a of the Civil Code defines "general damages" as those for loss of reputation, shame, mortification and hurt feelings [subd. 4(a)], and "special damages" as those suffered in respect to property, business, trade, profession or occupation [subd. 4(b)]. (*Pridonoff* v. *Balokovich,* 36 Cal.2d 788, 791 [228 P.2d 6].) The allegations under consideration do not refer to damages suffered in respect to the plaintiff's occupation but only to his occupational reputation. In support of his position the plaintiff cites *Oberkotter* v. *Woolman,* 187 Cal. 500, 504 [202 P. 669] wherein the court upheld a complaint for slander as against a general demurrer attacking the sufficiency of special damage allegations which stated that the plaintiff "lost, and will continue to lose and be deprived of, great gains and profits which would otherwise have accrued to him in his calling, occupation, and profession." The difference between these allegations and those in the case at bar is obvious. The cited case does not support the plaintiff's position. The foregoing contention is without merit and the order sustaining the defendants' general demurrer to this cause of action was proper.

As the trial court erred in sustaining the general demurrer

to the second count of the plaintiff's fourth amended complaint, the judgment dismissing the action upon plaintiff's failure to amend must be reversed. (*Mills* v. *Mills,* 147 Cal. App.2d 107, 124 [305 P.2d 61]; *Shook* v. *Pearson,* 99 Cal. App.2d 348, 351 [221 P.2d 757]; *Armstrong* v. *Adams,* 102 Cal.App. 677, 681 [283 P. 871]; *McFarland* v. *Cordiero,* 99 Cal.App. 352, 356 [278 P. 889].) In passing upon the sufficiency of the second cause of action the court did not consider the special demurrer. Under the circumstances now present the sufficiency of this cause of action against objections raised by the special demurrer should be decided.

The judgment is reversed with instructions to the trial court to reconsider the demurrer to the second cause of action and thereupon to proceed in accord with the law in the premises.

Griffin, P. J., concurred.

A petition for a rehearing was denied May 29, 1961, and respondents' petition for a hearing by the Supreme Court was denied July 5, 1961.