[No. B200481. Second Dist., Div. Five. Mar. 19, 2009.]

MICHAEL REGALIA, Plaintiff and Respondent, v.
THE NETHERCUTT COLLECTION et al., Defendants and Appellants.

## COUNSEL

Baker, Keener & Nahra, Robert C. Baker and Laurence C. Osborn for Defendants and Appellants.

Marvin E. Krakow for Plaintiff and Respondent.

OPINION

MOSK, J.—

## INTRODUCTION

We hold statements by defendants that plaintiff, an automobile museum president, (1) demanded a commission or a finder's fee to which he was not entitled, and (2) was fired because other employees would not work for him and would leave if he stayed, should have been presented to the jury as slander per quod rather than as slander per se. Accordingly, we reverse the judgment in favor of plaintiff. Because the jury found that plaintiff did not suffer actual damages, a necessary element of an action for slander per quod, defendants are entitled to judgment without a retrial.

## BACKGROUND

J. B. Nethercutt, father of defendant and appellant Jack B. Nethercutt II (Nethercutt) and the founder of the Merle Norman Cosmetics Company, began collecting automobiles in 1956. In 1978, plaintiff and respondent Michael Regalia left his position as a partner in an automobile body and paint shop to work for J. B. Nethercutt on J. B. Nethercutt's private automobile collection, known as the Merle Norman Classic Beauty Collection.

In 1995, the Merle Norman Classic Beauty Collection became The Nethercutt Collection, an automobile museum with restoration facilities.[1] J. B. Nethercutt had established The Nethercutt Collection as a not-for-profit foundation funded by his estate. J. B. Nethercutt appointed Regalia as executive vice-president of the foundation and thereafter as president of the foundation.

J. B. Nethercutt remained in charge of The Nethercutt Collection until he was hospitalized in August 2004. At that time, Nethercutt assumed control of the overall operations of The Nethercutt Collection, subject to his father's approval. J. B. Nethercutt died in December 2004.

According to Regalia, he thereafter met with Nethercutt and discussed, inter alia, his, Regalia's, compensation with Nethercutt. Regalia stated at that meeting that he had played an integral part in obtaining a donation to The Nethercutt Collection from Betty Locke of her Talbot-Lago automobile,

---

[1] Nethercutt and The Nethercutt Collection together are referred to as defendants.

which was appraised at $2.3 million. Regalia also stated that he had been under budget every year he had been president, and that he believed he had earned "consideration for more compensation." Nethercutt offered Regalia a $10,000 raise. Regalia stated that he did not believe that was enough. Nethercutt said he would think about it and let Regalia know his decision the next day. The next day, Nethercutt raised Regalia's salary by $35,000, to $160,000 per year. Because J. B. Nethercutt had died recently, Nethercutt believed that Regalia was still needed by The Nethercutt Collection.

Nethercutt testified that Regalia told him that Regalia wanted a 10 percent finder's fee for the "Talbot" donation. Nethercutt informed Regalia that 10 percent of the appraised value was $230,000. According to Nethercutt, Regalia acknowledged that was the amount he wanted, and Nethercutt refused to pay Regalia the finder's fee. Nethercutt terminated Regalia's employment. Regalia denied that he asked for a commission for the Talbot-Lago contribution.

Shortly after Regalia's termination, Nethercutt held a meeting of employees of The Nethercutt Collection. According to Christopher Parker, one of the employees at that meeting, Nethercutt stated that he thought that Regalia acted as if he owned the museum. Nethercutt stated that certain people did not want to work for Regalia, and, therefore, Nethercutt had to terminate Regalia. According to Kenneth Sisk, another employee who apparently described the same meeting, Nethercutt said that "people would leave if Mr. Regalia had stayed."

The following week, Nethercutt and his wife Helen Nethercutt, a Nethercutt Collection board member, held a meeting attended by most of the restoration staff. According to Parker, who was present at that meeting, Helen Nethercutt stated that Regalia had said some hurtful things about her and that Regalia wanted a $250,000 finder's fee for the Talbot-Lago donation.

According to Nethercutt, in about April 2005, Locke, the donor of the Talbot-Lago, was present at The Nethercutt Collection's facility having work performed on an automobile. When in the presence of Lisa De Lao, the secretary for The Nethercutt Collection, Locke asked Nethercutt why Regalia had been terminated. Nethercutt stated that Regalia had been terminated for the good of The Nethercutt Collection. Nethercutt informed Locke that Regalia had demanded a finder's fee on the donation of her Talbot-Lago. Nethercutt did not think that Locke believed him. Nethercutt also told Locke that "the employees couldn't get along with Mike Regalia, or Mike Regalia couldn't get along with the employees"; that "people were threatening to

leave if [Regalia] stayed"; and that, in his opinion, Regalia "had been abusive." Apparently describing the same conversation, Locke testified that Nethercutt told her that he terminated Regalia because, "if he had not fired him, all of the other personnel would have quit."

According to Bruce Meyer, a board member of The Nethercutt Collection, Nethercutt told him that Regalia demanded a finder's fee for helping The Nethercutt Collection acquire Locke's Talbot-Lago. Meyer did not believe that Nethercutt would fabricate such an account. If the event actually occurred, Meyer would view such a demand as inappropriate because Regalia was an employee of The Nethercutt Collection, and he believed that Regalia's efforts to acquire the Talbot-Lago were "just part of his line of work."

In his deposition, Nethercutt was asked if Helen Nethercutt had told people in Nethercutt's presence that Regalia had tried to extort money from The Nethercutt Collection. Nethercutt responded, "Only in the aspect that he demanded a finder's fee for the Talbot-Lago." There is no evidence that Nethercutt actually said that Regalia attempted to extort money.

Regalia testified that his new restoration business, Regalia Concours Restoration, depended on the car collecting community, and his potential customers were those at the top level of that community. Such customers needed to trust Regalia and believe in his integrity.

## PROCEDURES

In a first amended complaint, Regalia asserted causes of action for wrongful termination in violation of public policy against The Nethercutt Collection, tortious interference with contract and advantageous business relations and opportunities against Nethercutt, and slander against both defendants. Nethercutt's demurrer to Regalia's tortious interference cause of action was sustained without leave to amend, and Regalia's wrongful termination and slander causes of action were tried to a jury. The alleged slanderous statements that the trial court presented to the jury in the instructions were (1) "Michael Regalia demanded a commission or finder's fee of about $230,000 to which he was not entitled," and (2) "The Nethercutt Collection fired Michael Regalia because other employees would not work for him, and that other employees would leave if Michael Regalia remained employed." The jury rejected Regalia's wrongful termination claim, but found that defendants had slandered Regalia. The jury found that Regalia had

suffered no "actual noneconomic damages," and awarded Regalia $750,000 in damages for assumed harm to Regalia's reputation. Defendants appeal.

## DISCUSSION

Regalia's slander cause of action was based on two statements: (1) that Regalia demanded a commission or finder's fee of about $230,000 to which he was not entitled, and (2) that Regalia was fired because other employees would not work for him, and that other employees would leave if Regalia remained employed. Defendants contend, among other things, that the trial court erred when it denied their request for an instruction on slander per quod and instead instructed the jury on slander per se.[2]

A. *Slander*

Civil Code section 46 provides, "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; [¶] 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him impotence or a want of chastity; or [¶] 5. Which, by natural consequence, causes actual damage."

A slander that falls within the first four subdivisions of Civil Code section 46 is slander per se and requires no proof of actual damages. (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 107 [15 Cal.Rptr.3d 215].) A slander that does not fit into those four subdivisions is slander per quod, and special damages are required for there to be any recovery for that slander. (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §§ 552–555, pp. 807–814.) One authority has stated that unlike libel, which is per se when defamatory on its face (see Civ. Code, § 45a), "[t]he extrinsic fact issue is irrelevant" for slander in connection with the per se and per quod distinction. (2 Smolla, Law of Defamation (2d ed. 2008) § 7:25, p. 7-34; see *Correia v. Santos* (1961) 191 Cal.App.2d 844, 852–853 [13 Cal.Rptr. 132]; *Jimeno v. Commonwealth Home Builders* (1920) 47

---

[2] Because we reverse the judgment on this basis, we do not reach defendants' additional arguments.

Cal.App. 660, 663 [191 P. 64] ["many charges which if merely spoken of another would not be actionable without proof of special damages will be libelous *per se* when written or printed and published"]; 1 Sack on Defamation (3d ed. 2006) § 2.8.3.2, p. 2-112 ["As a practical matter, words that, uttered orally, are slanderous per se are *usually* also libelous per se when written. But the reason they are slanderous per se normally has little to do with the reason they are libelous per se"]; 2 Dobbs, The Law of Torts (2001) § 408, pp. 1140–1144.)[3]

■ Subdivisions 1 (crime) and 3 (occupation) of Civil Code section 46 "have been held to include almost any language which, *upon its face*, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation [citations]; and words *clearly* conveying a meaning within one of the statutory categories are actionable *per se.*" (*Washer v. Bank of America* (1943) 21 Cal.2d 822, 827 [136 P.2d 297], italics added, disapproved on other grounds by *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 551 [343 P.2d 36].) In connection with subdivision 3 of Civil Code section 46, "to be actionable *per se*, a defamatory statement must tend 'directly' to injure the person defamed in respect to his office, profession, trade or business . . . ." (*Correia v. Santos, supra*, 191 Cal.App.2d at p. 852.) Whether a statement "upon its face . . . clearly convey[s] a meaning" within subdivision 3 (*Washer v. Bank of America, supra*, 21 Cal.2d at p. 827) so as to be a slander per se is a question for the court. (*Mercado v. Hoefler* (1961) 190 Cal.App.2d 12, 21 [11 Cal.Rptr. 787] ["The judge's determination that the language used constituted slander *per se* in respondent's instruction number 7 was part of his judicial function . . . ."]; 1 Sack on Defamation, *supra*, § 2.8.4, p. 2-115 ["It is a question of law, for the court to determine, whether a communication is libelous or slanderous per se. But it remains within the province of the jury to determine whether the reader understood the article, in light of relevant extrinsic facts, if any, to be defamatory"]; *Williams v. Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 410 [46 Cal.Rptr. 135] [libel]; *Correia v. Santos, supra*, 191 Cal.App.2d at pp. 853–854 ["Whether an oral statement is susceptible of a slanderous interpretation is a question for the court although the issue as to whether it was so understood is a question for the trier of fact."]; cf. *MacLeod v. Tribune Publishing Co., supra*, 52 Cal.2d at p. 546.)

With respect to slander per se, the trial court decides if the alleged statement falls within Civil Code section 46, subdivisions 1 through 4. It is then for the trier of fact to determine if the statement is defamatory. This

---

[3] Commentators have criticized the distinctions between slander and libel, and the application of per se and per quod with respect to libel and slander, as being confusing. (See 1 Sack on Defamation, *supra*, §§ 2.8–2.8.6, pp. 2-102 to 2-125; 2 Dobbs, The Law of Torts, *supra*, §§ 408–409, pp. 1140–1147; 2 Smolla, Law of Defamation, *supra*, § 7:1, p. 7-3.)

allocation of responsibility may appear, at first glance, to result in an overlap of responsibilities because a trial court determination that the statement falls within those categories would seemingly suggest that the statement, if false, is necessarily defamatory. But a finder of fact might rely upon extraneous evidence to conclude that, under the circumstances, the statement was not defamatory.

Regalia brought his slander cause of action solely on a per se theory under subdivision 3 of Civil Code section 46. As discussed above, with respect to plaintiff's claim under subdivision 3 of section 46, a false and unprivileged oral publication is slander per se when it "[t]ends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits." (Civ. Code, § 46, subd. 3; see 5 Witkin, *supra*, Torts, §§ 552–553, pp. 807–809.)

B. *Statements Not Slander Per Se*

 There is an array of cases determining whether a statement fits within the category of injury to business reputation. "The category is especially indeterminate and must be defined largely as cases arise." (2 Dobbs, Law of Torts, *supra*, § 408, p. 1142.) Most of the cases that fit within that category involve statements that reflect on the integrity and competence of the plaintiff, the clearest being allegations of unethical activity or incompetence. (See 5 Witkin, *supra*, Torts, § 553, pp. 808–809.) As one author stated, "[t]he disparagement must be more than general defamation of the victim's character, it must go to a characteristic particularly relevant to the victim's occupation." (2 Smolla, Law of Defamation, *supra*, § 7.16, p. 7-20.) "Courts seem to be looking for conduct that might be deemed to reflect character or at least habitual misconduct rather than a passing peccadillo." (2 Dobbs, Law of Torts, *supra*, § 408, p. 1142.) " '[I]t is not sufficient that the words be merely injurious to one whatever his pursuit, but they must prejudice him in the special profession or business in which he is actually engaged.' " (*Correia v. Santos, supra*, 191 Cal.App.2d at p. 853.)

In this case the trial court focused on two statements—that Regalia demanded a finder's fee to which he was not entitled and that other employees would not work for Regalia and would leave if he remained employed by The Nethercutt Collection. Just those two statements must be evaluated to determine if "upon [their] face" they "clearly convey[] a meaning" (*Washer v. Bank of America, supra*, 21 Cal.2d at p. 827) that fits

within subdivision 3 of Civil Code section 46, and therefore, if defamatory, are slander per se. We conclude that they do not.

A person can make a claim for money that is rejected as not being justified, and still not be viewed as having committed an act that reflects negatively on that person. Thus a statement about such a claim does not necessarily "directly . . . injure him in . . . his profession, trade or business" (see *Correia v. Santos, supra,* 191 Cal.App.2d at p. 852) so as to fit within subdivision 3 of Civil Code section 46. (See *Gang v. Hughes* (9th Cir. 1954) 218 F.2d 432 [alleged statements that a plaintiff's attorney refused to settle a case until he was paid and that he was paid because he demanded immediate payment not slander or libel per se].) Likewise, the statement that Regalia was fired because other employees would not work for him and would leave if he remained employed does *not,* on its face, clearly fall within subdivision 3 of Civil Code section 46. That one or more employees do not want to work for someone, without more, again, does not necessarily reflect adversely on the person. The employee or employees might not want to work for a person because of the person's work ethic or rectitude, or legitimate business policies.

Those statements may by "natural consequence" cause plaintiff actual damages. (Civ. Code, § 46, subd. 5.) But that makes them slander per quod and requires proof of actual damages.

## C. *No Retrial*

To succeed on a slander per quod theory, Regalia was required to prove actual damages. (Civ. Code, § 46, subd. 5.) The jury found that Regalia did not suffer actual damages. Because Regalia had a full and fair opportunity to litigate the issue of actual damages in the trial court, and he does not challenge on appeal the jury's finding that he did not suffer any damages,[4] retrial of that issue is unnecessary. (See *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679 [58 Cal.Rptr.3d 686]; Eisenberg et al., Cal. Practice Guide, Civil Appeals and Writs (The Rutter Group 2008) ¶ 11:73, p. 11-26 (rev. # 1, 2008) ["If the record indicates what the proper judgment or order should have been, the appellate court can reverse with directions to enter that judgment or order. [Citations.]"].) Accordingly, although we have reversed the judgment against defendants, remand for retrial is unnecessary. The trial court is to enter judgment in favor of defendants.

---

[4] The actual finding was that Regalia did not suffer "actual noneconomic damages." At oral argument, Regalia did not dispute that by this finding the jury found no actual damages.

## DISPOSITION

The judgment is reversed. The trial court is ordered to enter judgment in favor of defendants. Defendants are awarded their costs on appeal.

Armstrong, Acting P. J., and Kriegler, J., concurred.

A petition for a rehearing was denied April 9, 2009, and respondent's petition for review by the Supreme Court was denied June 10, 2009, S172396.