[Civ. No. 28139. Second Dist., Div. Three. Jan. 19, 1966.]

THOMAS F. NOONAN, Plaintiff and Appellant, v. JOHN H. ROUSSELOT et al., Defendants and Respondents.

Phill Silver for Plaintiff and Appellant.

Wright, Wright, Goldwater & Mack, Loyd Wright and Edgar R. Carver, Jr., for Defendants and Respondents.

KAUS, J.—This litigation is the detritus of the Republican primary election for the office of Representative of the 25th Congressional District in June of 1962.

Plaintiff's original complaint was entitled "Complaint for Damages, Conspiracy to Deprive Plaintiff of a Fair Election." It contained only one count. After a demurrer was sustained with leave to amend, plaintiff filed a two count complaint retaining what, for the sake of brevity, we will call the "conspiracy" count and adding a cause of action for libel. Another demurrer by defendants was sustained, without leave to amend as to the conspiracy count and with leave as to the

libel count. Plaintiff made two more attempts to amend the libel count and finally a demurrer to his third amended complaint was sustained without leave to amend further. The judgment appealed from ensued.

Both counts are based on essentially the same facts. Such differences as there are will be noted. Briefly summarized this is what is alleged in the libel count: when plaintiff qualified as a candidate against defendant Rousselot, the defendants agreed (''entered into a conspiracy'') to cause his defeat and to cause the nomination of Rousselot at the primary election; to accomplish this purpose they agreed to and did publish a ''tabloid'' in newspaper format alleging in effect that plaintiff was not a bona fide Republican, that he was entered in the campaign by the ''collectivists and left wing democrats'' to deceive the Republican voters, that he had conspired with the communist element in the Democratic Party (''collectivists and left wing democrats'') to receive their support and that he was disloyal to his country.[1] The ''tabloid'' was then widely distributed to prospective Republican voters. The complaint then goes on to recite plaintiff's biography and contains very detailed and unnecessary (*Lipman* v. *Brisbane Elementary Sch. Dist.*, 55 Cal.2d 224, 233 [11 Cal.Rptr. 97, 359 P.2d 465]) denials of the truth of the statements made in the tabloid and their alleged defamatory import. ██ Apart from certain conclusory allegations of malice, there is no trace of any allegation that defendants knew that their statements were false, that they had no honest belief in their truth or that they had no reasonable grounds for believing them to be true.

There is also an allegation that the ''tabloid'' did not comply with section 12047 of the Elections Code, a section since held to be unconstitutional. (*Canon* v. *Justice Court*, 61 Cal.2d 446 [39 Cal.Rptr. 228, 393 P.2d 428][2].)

---

[1]Treason, communism and ''fellow traveling'' appear to be the alleged defamatory imputations pleaded in the complaint. We have serious doubts whether the ''tabloid,'' which is reproduced in the appendix to this opinion, justifies such an innuendo. Defendants argue in their brief that it is ''completely unreasonable and absurd to claim'' that anyone left of center, be he a left wing Republican such as Governor Rockefeller or Chief Justice Warren, or a left wing Democrat or even a left wing socialist is a communist and fellow traveler. In view of our disposition of this case we find it unnecessary to discuss the correctness of their position.

[2]The section was held unconstitutional because it discriminated against individuals rather than California voters. It has since been rewritten to avoid that defect. In no event, however, would it apply to the publica-

The conspiracy count contains certain additional allegations as follows: the defendant Rousselot published an open letter to the plaintiff accusing him of not being a bona fide candidate, of being completely surrounded by elements of the left wing collectivist movement and of making remarks which closely "mimic the very attacks that the People's World, a known communist paper published in San Francisco, had made upon the anti-communist, Constitutional movement in this country." It also, for reasons not apparent to us, contains a campaign statement made by plaintiff in which he asked the Republican voters of the district to "express their contempt for the fanatical fringe represented by John Rousselot," implied that he belonged to a "lunatic fringe who pretend to be Republicans but who . . . have driven thousands of citizens into the arms of the Democrats" and accused Rousselot of doing "more damage to the cause of America than the meanest communist spy." The complaint also alleged that in his campaign literature plaintiff adopted an editorial concerning the John Birch Society published in the Los Angeles Times which ends with the following sentence: "Subversion whether of the left or the right, is still subversion."[3]

The conspiracy count also contains an allegation that plaintiff lost the election because of the conduct described.

The briefs of the parties are in large measure devoted to discussing the problem of whether, apart from libel, the law allows an action for "unfairly depriving a candidate of a fair election." We need not decide that point, for it is clear that if defendants' utterances are protected by the First Amendment, the power of this state to penalize them does not depend on the name given to the wrong. ". . . a state cannot foreclose the exercise of constitutional rights by mere labels."

tion in question here. In *Canon* v. *Justice Court, supra,* at page 452, footnote 6, our Supreme Court holds that it is aimed at writings "designed primarily to injure candidates by personal attacks rather than impersonal criticism of their views or official conduct." We are inclined to believe that the "tabloid" comes under the heading of impersonal criticism. We say nothing about plaintiff's undisclosed premise that the violation of a statute by defendants automatically makes them liable to him. The point was mooted but not resolved in *Hudson* v. *Craft,* 33 Cal.2d 654, 660 [204 P.2d 1, 7 A.L.R.2d 696] and has not, to our knowledge, been decided since.

[3]While we cannot understand the reasons for including plaintiff's campaign material in his complaint, it seems that both he and his opponent foresaw the Supreme Court's mandate that "debate on public issues should be uninhibited, robust, and wide-open and. . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks. . . ." (*New York Times Co.* v. *Sullivan,* 376 U.S. 254, 270 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412].)

(*N.A.A.C.P.* v. *Button,* 371 U.S. 415, 429 [83 S.Ct. 328, 9 L.Ed.2d 405].)

 In *New York Times Co.* v. *Sullivan,* 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412], the case which we deem to be controlling, the Supreme Court said: "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, *with knowledge that it was false or with reckless disregard of whether it was false or not.*" (*Ibid.,* pp. 279-280, Italics added.)

 It is clear that if the state unconstitutionally proscribes free speech, it matters not what it chooses to call the wrong, or whether it seeks to punish the speaker directly in a criminal action, indirectly by allowing a person allegedly aggrieved to recover civil damages or proceeds by injunctive process. Thus in *N.A.A.C.P.* v. *Button, supra,* the State of Virginia was foreclosed from applying certain statutes forbidding the solicitation of legal business, where such application interfered with a form of political expression and a means for achieving lawful objectives. In *Brotherhood of R.R. Trainmen* v. *Virginia State Bar,* 377 U.S. 1 [84 S.Ct. 1113, 12 L.Ed.2d 89], the *N.A.A.C.P.* case was followed where the state, through its bar association, sought to enjoin what it deemed to be unlawful solicitation and unauthorized practice of law by a labor union, but where the Supreme Court felt that the injunction violated the First Amendment rights of the members of the union to consult with one another on mutual problems. In *Speiser* v. *Randall,* 357 U.S. 513 [78 S.Ct. 1332, 2 L.Ed.2d 1460] the constitutional requirement of this state denying a tax exemption to persons who advocate the unlawful overthrow of the Government of the United States was held to be invalid because California's particular statutory provisions denied freedom of speech in that they placed the burden of proof that he had not engaged in speech which may be constitutionally prohibited on the taxpayer. In *Edwards* v. *South Carolina,* 372 U.S. 229 [83 S.Ct. 680, 9 L.Ed.2d 697] it was held that Negroes who had assembled on the grounds of the South Carolina State House to submit a protest against certain alleged discriminatory actions, who had refused to disperse and instead listened to a "religious harangue" by one of their leaders and sang patriotic and religious songs, should not be punished under a

state law denominated "breach of the peace." In *Bridges* v. *California*, 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346], this state was held powerless to punish permissible speech by the exercise of the contempt power of our courts.

We could go on almost indefinitely, but enough has been said to show that whether we examine defendants' actions under the traditional rules relating to libel or in the light of the novel civil wrong which plaintiff wishes us to establish, the constitutional considerations apply with equal force.

It is of course true that Noonan was not a "public official" in the narrow sense of the word when he ran against the incumbent Rousselot in the Republican primary. He was, however, a candidate as defined in section 11501 of the Elections Code and as such he assumed certain duties, for example the filing of a verified campaign statement after the election, (Elec. Code, § 11560) failure to file being a misdemeanor. (Elec. Code, § 12053.) ▮ Apart from such technicalities, however, it must be obvious that whatever rights of free speech the Constitution guarantees to the public with respect to criticism of incumbent public officials, must also be granted to the latter and their supporters in an election campaign, when their speech is addressed to the qualifications of those trying to turn the "ins" out.

Our own Supreme Court, in a case applying our statutory qualified privilege (Civ. Code, § 47, subd. 3) rather than the First Amendment, perceived no distinction between a mere candidate and an incumbent. (*MacLeod* v. *Tribune Publishing Co.*, 52 Cal.2d 536, 551 [343 P.2d 36].)

▮ Besides, any rule of law which would differentiate between the freedom of speech allowed to an incumbent running for reelection and that permitted to him who seeks his office, would run afoul of the equal protection clause of the Fourteenth Amendment.

▮ We hold therefore that unless defendants acted with actual malice, as defined in *New York Times Co.* v. *Sullivan, supra.* plaintiff does not have a cause of action.

▮ Of course, there is nothing in *New York Times Co.* v. *Sullivan* prescribing any particular way in which the plaintiff in a libel action, pending in a state court, must plead "actual malice," but we see no reason for not applying our well established rules that malice must be pleaded if the complaint reveals the existence of a privilege which the proof of actual malice is designed to defeat (*Locke* v. *Mitchell*, 7 Cal.2d 599

[61 P.2d 922]) and that the pleading of malice must set forth specific facts which indicate the existence of personal malice. (*Maidman* v. *Jewish Publications, Inc.*, 54 Cal.2d 643, 653 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]; *Locke* v. *Mitchell, supra*, at p. 603; *Lesperance* v. *North American Aviation, Inc.*, 217 Cal.App.2d 336, 341-342 [31 Cal.Rtr. 873]; and *Everett* v. *California Teachers Assn.*, 208 Cal.App.2d 291, 295 [25 Cal.Rptr. 120].)

We recognize that in requiring the pleading of specific facts to show actual malice California belongs to the minority of the jurisdictions which have spoken on the subject. (See cases collected in 76 A.L.R.2d 696.) It seems also that our cases have gone further than learned writers recognizing the existence of our strict rule have felt necessary. (See Chadbourn, Grossman, Van Alstyne, California Pleading, section 999, and particularly the authors' comments on recent cases cited in the 1964 supplement.) The rule, however, serves a salutary purpose: it makes it impossible for a plaintiff who is faced with a qualified privilege to force the case to issue by the naked allegation that defendant acted "maliciously."

We recognize also that on occasion relatively meager facts have been held to satisfy our California rule. Thus in *MacLeod* v. *Tribune Publishing Co.*, 52 Cal.2d 536, 551-552 [343 P.2d 36] the Supreme Court held—on ample authority— that if it appears from the pleading that the defendant published the alleged libel with knowledge of its falsity or without an honest belief in its truth or without reasonable grounds for believing it to be true, the pleading is sufficient.[4] Although the pleading in *MacLeod* did not specifically allege these matters, the Supreme Court held that under the circumstances of that case such allegations were implicit in the allegation that the article was false and furthermore that any defect in pleading the basis for the allegation of actual malice "could easily be cured by amendment." In the case before us plaintiff has surely had ample opportunity to plead his best case.[5]

---

[4] It is arguable that this test runs afoul of actual malice as defined in *New York Times Co.* v. *Sullivan*, in that a "reckless disregard" of whether the publication is true or false implies a more reprehensible state of mind than the lack of "reasonable grounds" for believing it to be true. We need not form or express an opinion on the point.

[5] In *MacLeod* the trial court had sustained a demurrer to the original complaint without leave to amend. In the present case the final ruling of the trial court was made with respect to the third amended complaint, plaintiff's third attempt to state a cause of action in libel.

■ Examining both the conspiracy count and the libel count for allegations of actual malice, we must hold that they are insufficient. There is an allegation that the defendants acted ''wickedly and maliciously,'' but this very allegation has been held to be a conclusion. (*Everett* v. *California Teachers Assn.*, 208 Cal.App.2d 291, 295 [25 Cal.Rptr. 120].)

In addition it is alleged that the ''tabloid'' was distributed ''for the express purpose of injuring plaintiff and causing his defeat'' and that the alleged libels were ''false, malicious and unprivileged and were calculated to and did expose the plaintiff to hatred, contempt, ridicule and obloquy, causing him to be shunned and avoided.''

■ We recognize that a qualified privilege such as is enjoyed by defendants under our state law (Civ. Code, § 47, subd. 3) may be lost not only by the defendants' lack of belief in the truth of their statements, but also if the publication is motivated by any cause other than the desire to protect the interest for the protection of which the privilege is given. (*Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 797 [197 P.2d 713]; *Freeman* v. *Mills,* 97 Cal.App.2d 161, 167 [217 P.2d 687]; Prosser, Law of Torts (3d ed. 1964) pp. 819-823; Rest., Torts, § 603.) If the publication is motivated by hatred or ill will, then of course the privilege is defeated, because the desire to protect the interest protected by the privilege is lacking.

We assume for the present that the United States Supreme Court, if called upon to do so, would allow a state to recognize that even in the political arena there may be an abuse of privilege where the privileged occasion is used as a mere pretense for defamatory language, motivated by spite or ill will. We cannot, however, read any such charge into the above quoted excerpts from plaintiff's complaint. Read in context there is no indication that plaintiff claims that defendants had any purpose in mind except to defeat him at the polls. Almost identical language was held in *MacLeod* v. *Tribune Publishing Co., supra,* to require an additional allegation concerning the defendant's frame of mind with respect to the truth of the defamatory matter.

■ The ''conspiracy'' count also contains the conclusory allegation that defendants ''did not act in good faith but for the sole purpose of arousing hatred and ill will against the plaintiff and to deprive him of his constitutional right to seek public office in a free and fair election.'' Both counts also charge ''malice, oppression and fraud'' as a basis for

punitive damages. Whatever liberality may be permissible in alleging malice, fraud or oppression as a basis for punitive damages (*James* v. *Herbert,* 149 Cal.App.2d 741, 749-750 [309 P.2d 91] and cases cited therein), fraud, like malice, when pleaded to support a cause of action, must be specifically pleaded. (*Hannon* v. *Madden,* 214 Cal. 251, 267 [5 P.2d 4]; *Slocomb* v. *City of Los Angeles,* 197 Cal.App.2d 794, 800 [17 Cal.Rptr. 529]; compare the detailed allegations of fraud held sufficient in *Maxwell* v. *City of Santa Rosa,* 52 Cal.2d 274, 279-281 [1 Cal.Rptr. 334, 347 P.2d 678].) We can see no reason for changing the rule in a situation where the pleader must, as here, plead a mental state analogous to fraud to avoid a privilege. Moreover, "bad faith" is not necessarily synonymous with fraud. (*Kahn* v. *Lischner,* 128 Cal.App.2d 480, 490 [275 P.2d 539]; cf. *Hodges* v. *Standard Accident Ins. Co.,* 198 Cal.App.2d 564, 574 [18 Cal.Rptr. 17].)

 We believe no useful purpose would be served by allowing plaintiff to amend in the light of this opinion simply because *New York Times Co.* v. *Sullivan* was decided after the judgment in this case. Prior California law contained ample inducement to plead actual malice as defined in that opinion.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 16, 1966.

## APPENDIX

"Page 2 "REPUBLICAN NEWS JUNE, 1962
"Official Republic News
Editorial

DEMOS SCHEME TO
UNDERMINE DISTRICT GOP

"Last year the Democrat controlled State Assembly in Sacramento, viciously 'gerrymandered' (reapportioned) our 25th District.

"Why? To defeat our able, dynamic Congressman Rousselot, whose outspoken conservatism poses a threat to the liberal-party in California. (We are not speaking here of those who are Democrats in the fine Jeffersonian tradition, who make up an appreciable portion of the Democrat party in our District.)

"At first the left wing Demos thought the 2-1 Democrat registration would psychologically destroy Congressman Rousselot and his supporters. However, he remained undaunted, and prepared to fight for the 25th seat.

"This panicked the left wing Demos. They frantically searched for

another weapon. They knew they must divide Republicans in order to conquer them.

"They seized upon an issue—the John Birch Society—because it has been so widely distorted and maligned.

"Now they needed a mouthpiece to present this issue. A left wing Democrat wouldn't do. He would be dismissed as partisan. But a Republican blasting on this issue would be another story.

"However, a regular, loyal Republican wouldn't allow himself to be USED as a pawn. The left wing Demos had to search for a Democrat registered as a Republican.

"They found him—on the letterhead of one of the left wing Democrat Congressional candidates and filed him at the very last moment.

"And—true to form—the collectivist Demos directed their chameleon to stay clear of the legitimate and important issues. He isn't qualified to speak on them anyway.

"Instead they have had him promote Hate—against the John Birch Society. Misrepresentation of its aims. Smear of Congressman Rousselot for his membership. Hysterical and unreasoned outbursts designed to create fear and apprehension.

"Why?—in an effort to harm our fine Republican Party—to divide our people. To hinder our chances in the November election.

"The left wing Democrats—and their lackey Noonan—will not succeed, for to know their aims and tactics is to be armed and ready.

"VICTORY—through unity and understanding—will be ours in November."