[S. F. No. 22666. In Bank. Oct. 24, 1969.]

RICHARD DALE KAPELLAS, a Minor, etc., et al., Plaintiffs and Appellants, v. ABRAHAM KOFMAN, Defendant and Respondent.

## COUNSEL

Gonick, Schmid & Bernstein and Louis M. Bernstein for Plaintiffs and Appellants.

Hardin, Fletcher, Cook & Hayes and Cyril Viadro for Defendant and Respondent.

## Opinion

**TOBRINER, J.**—Plaintiff Inez Kapellas filed suit on her own behalf and on behalf of her minor children against defendant Abraham Kofman, owner and publisher of the Alameda Times Star and Times Star Advertiser,[1] in connection with a published newspaper editorial. The third amended complaint consisted of three causes of action. The first cause sought recovery of general and punitive damages on Mrs. Kapellas's own behalf for alleged libelous material published by defendant in the Alameda Times Star and Times Star Advertiser. The second cause prayed for damages for the alleged libels on behalf of the children of Mrs. Kapellas. The third cause alleged that the editorial constituted an actionable invasion of privacy of Mrs. Kapellas's minor children.

The defendant demurred to the first two causes upon the ground that the editorial was privileged because it concerned the qualifications of one seeking a public office, and upon the further ground that plaintiffs did not allege a sufficient demand for retraction in the manner required by Civil Code section 48a. As to the third cause of action, defendant demurred upon the basis that the comments did not constitute an actionable invasion of the children's privacy: it contained comments "regarding persons who were of public interest and were about matters of public interest." The trial court sustained the demurrer without leave to amend and thereafter dismissed the entire action. Although we concur in the trial court's affirmation of the demurrer as to the third cause of action, we shall point out that the complaint establishes actionable causes in the first two counts.

The case emanates from an editorial[2] published on page one of the

---

[1] Plaintiff initially joined Sara Kofman, the Alameda Times Star, and the Times Star Publishing Company as additional defendants. We can discover no lower court motion dismissing these parties as defendants, nor any indication in the record that plaintiff has agreed to dismiss them from the suit; the notice of appeal referred to all parties. The petition for hearing by this court, however, designates Abraham Kofman as the sole defendant. In any event, the substantive issues are identical with respect to all the initial defendants.

[2] "CHILDREN'S WELFARE MUST COME FIRST

"Mrs. Inez Kapellas has taken a forceful interest in political matters in Alameda and now she is a candidate for the City Council.

"This is a democracy, of course, and it is altogether fitting and proper that Mrs. Kapellas should run if she wants to.

"But we question the wisdom of her decision.

"You see, Mrs. Kapellas, who has been married twice, is the mother of six young children.

"Now, six children is quite a family, as we all know. And growing children need constant attention and care.

"Mrs. Kapellas already has a job which keeps her away from her home during the daytime. If she takes on City Council chores, she will also find that she is kept away from her children on many evenings.

"We are thinking of the best welfare of the children involved. We are wondering

Alameda Times Star on February 25, 1965, and republished on page three of the Times Star Advertiser on March 3, 1965, discussing certain alleged facts as to Mrs. Kapellas (hereafter designated "plaintiff"), who was at the time a candidate for the city council.

On March 3, one week after the first editorial appeared in the Alameda Times Star, plaintiff's attorney sent a letter[3] to defendant Abraham Kofman demanding a "correction" of the article. On March 5 the attorney

---

if the children of Mrs. Kapellas won't be the innocent victims if their mother is elected to the City Council.

"Mrs. Kapellas's obligations, at least at the present, would seem to be more to her home and family, than to the city she adopted as home some years ago.

"There are reports on the Alameda police blotter which show that Mrs. Kapellas is needed in her home, more than she is needed anywhere else. In fact, the Kapellas children have caused a great deal of bother for local police, the police blotter shows.

"One son has been picked up for suspicion of shoplifting. Another son has been in trouble for attempted burglary, loitering and truancy, and was once found with a sum of money which he first said he had found on the beach but which police later found the boy had taken from his mother's purse. One little girl has been found wandering on the street several times and had to be taken home.

"Neighbors, the police blotter shows, also have appealed to the Alameda County district attorney's office here—complaining of foul and obscene language emanating from the Kapellas household and heard by innocent neighborhood children.

"For all these reasons, we can not endorse Mrs. Kapellas for election to the City Council. We feel that with six children to attend to, she must give them her first consideration.

"Out of courtesy to Mrs. Kapellas, we have refrained from publishing various police reports which would lead to the supposition that this newspaper was 'picking' on her, even though it is the policy of the Times Star to name youngsters when they repeatedly get into trouble.

"We feel, by the same token, that now it is our duty to advise the voters. In bringing out these facts we are saying only that children need care—the Kapellas children, like all others, need constant care—and who will give it to them if their mother becomes bound up in the wearying, constant and demanding duties of the City Council?

"We are certain every parent will understand this position.

"We urge the voters, therefore, to consider these little children, and to consider, too, that the City Council is a tough and taxing job, and one that would keep Mrs. Kapellas away from her children a good deal—and too much of the time."

[3]"NOTICE

"YOU ARE HEREBY NOTIFIED that every statement concerning the conduct of the children of Mrs. Inez Kapellas and every statement concerning Mrs. Kapellas' qualifications for the City Council and her suitability as a mother made in the article denoted as an Editorial and entitled 'Children's Welfare Must Come First', and published in the Alameda Times Star on February 25, 1965, on page 1 thereof, are claimed by Mrs. Inez Kapellas and her children, Richard Kale Kapellas, Philip Gregory Kapellas, Caron Michelle Kapellas, Robert James Kapellas, Christopher Alan Kapellas, and Therese Angela Kapellas to be libelous.

"Demand is accordingly made on behalf of said persons by the undersigned that a correction of said statements be published in substantially as conspicuous a manner in said newspaper as were said statements claimed to be libelous, in a regular issue thereof published within three weeks after service of this notice upon you. In default of such correction, said persons intend to bring an action against you for general and exemplary, as well as special damages."

dispatched an identical letter as to the republication of the editorial in the Times Star Advertiser. Defendant Kofman did not reply to these notices; he neither sought clarification of the demands nor asserted his belief in the truth of the published editorial. Defendant did not retract or correct any of the statements contained in the editorials.

We proceed to explain under separate headings that (1) the allegations of the complaint as to malice defeat defendant's defense of privilege; (2) plaintiffs alleged a sufficient demand for retraction in the manner required by Civil Code section 48a[4] and (3) plaintiffs fail to establish in their third count an actionable cause for an invasion of privacy.

## 1. The allegations of malice defeat defendant's defense of privilege

■ Since the instant complaint discloses that the editorial in question commented upon the qualifications of plaintiff, a candidate for the Alameda City Council, the publisher acquired the qualified privilege granted by Civil Code section 47, subdivision 3.[5] (*Snively* v. *Record Publishing Co.* (1921) 185 Cal. 565, 571 [198 P. 1].) ■ ■ As we explain, however, defendant fails to establish that the plaintiff's allegations of malice do not suffice to defeat this asserted privilege. (Cf. *Locke* v. *Mitchell* (1936) 7 Cal.2d 599. 602 [61 P.2d 922]; *Harnish* v. *Smith* (1956) 138 Cal.App.2d 307, 310 [291 P.2d 532].)[6]

Supplementing its concededly conclusory claims that defendant "wrong-

[4]Section 48a provides in relevant part: "1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous. 2. If a correction be demanded within said period and be not published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages . . . ."

[5]Section 47 provides in relevant part: "A privileged publication is one made . . . 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication is innocent, or (3) who is requested by the person interested to give the information."

[6]We note additionally that the proof of malice at trial must not only satisfy the requirements of our statutory privilege but must, of course, meet the demands of the federal Constitution. As held in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707, 84 S.Ct. 710, 95 A.L.R.2d 1412], and reiterated in *Garrison* v. *Louisiana* (1964) 379 U.S. 64, 74 [13 L.Ed.2d 125, 132, 85 S.Ct. 209], plaintiff may recover against one who issues such a publication only if defendant did so "with knowledge that it was false, or with reckless disregard of whether it was false or not." Reading the present complaint in a light most favorable

fully, wickedly, and maliciously" printed the editorials, the complaint alleges a detailed account of past and continuing conflicts between the defendant and plaintiff. Thus plaintiff first states that defendant's hostility toward her initially arose out of her activities, in 1964, as the leader of a group, "Alameda Citizens for the Protection of Property Rights," which organized and led a successful campaign against an urban renewal ballot proposal in the City of Alameda. Defendant allegedly supported the ballot measures and would have realized substantial financial gain if the urban renewal project had been approved.

The complaint further states that one of the candidates opposing plaintiff in the city council election was an "agent or officer" of a company owned and controlled by the defendant. Additional friction between the parties allegedly resulted from the plaintiff's announced opposition to a series of real estate developments planned for Alameda, developments in which defendant purportedly had invested a significant sum. The complaint finally recounts a conversation in which defendant warned plaintiff that if she did not remove herself as a candidate for the city council "he would print all the 'dirt' he could find concerning plaintiff's family." As a result of this hostile relationship, the complaint alleges, defendant published the editorial "well knowing that it was false or with reckless disregard of whether it was false or not."

This court has in the past consistently held that allegations of malice similar to those set forth above defeated the qualified privilege of section 47. (*Maidman* v. *Jewish Publications, Inc.* (1960) 54 Cal.2d 643 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]; *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 797-799 [197 P.2d 713]; *Washer* v. *Bank of America* (1943) 21 Cal.2d 822, 831 [136 P.2d 297, 155 A.L.R. 1338].). ■ ■ In the instant case plaintiff has alleged the presence of detailed facts which would justify the trier of fact in finding that defendant published the editorial primarily because of "hatred or ill will towards the plaintiff." (Civ. Code, § 48a, subd. 4(b); see, e.g., *Maidman* v. *Jewish Publications, Inc., supra,* 54 Cal.2d 643, 654; *Hearne* v. *De Young* (1901) 132 Cal. 357, 361-362 [64 P. 576]; *Davis* v. *Hearst* (1911) 160 Cal. 143, 157-163 [116 P. 530].)[7] The allegations of malice are thus sufficient to dispatch the defense of the privilege of section 47.

to plaintiff, as we are required to do in passing on a demurrer, we find that the constitutional requirements of malice are adequately alleged.

[7] The argument has been advanced that these allegations of malice toward Mrs. Kapellas fail to sustain the libel claims of her children. Because of the children's close relation to their mother, however, misstatements about their conduct would redound to the detriment of their mother; thus the showing of malice toward Mrs. Kapellas prima facie contravenes any presumption that defendant's statements about the children were innocent (cf. Civ. Code, § 47, subd. 3(2)), and illustrates that the publication was motivated "by [a] cause other than the desire to protect the interest for the protection of which the privilege is given." (*Brewer* v. *Second Baptist Church*

## 2. *Plaintiff alleged a sufficient demand for retraction in the manner required by Civil Code section 48a*

■ The Legislature enacted Civil Code section 48a to encourage a more active press by means of an increased insulation of newspapers from liability arising from erroneous published statements.[8] The statute represents a significant change from common law libel,[9] which at one time permitted a plaintiff libelled even by an innocent misstatement to recover general damages without proving actual injury. (See, e.g., *Peck* v. *Tribune Co.* (1909) 214 U.S. 185, 189 [53 L.Ed. 960, 962, 29 S.Ct. 554] (Holmes, J.); *Taylor* v. *Hearst* (1895) 107 Cal. 262, 269 [40 P. 392].) Under section 48a an individual cannot recover anything beyond "special damages"[10] unless he shows that he has requested, within 20 days after learning of the publication, that the publisher correct the allegedly libelous material, and that the publisher has failed to do so. The section also provides that the request for correction must be made by "a written notice specifying the statements claimed to be libelous. . . ."[11] Although defendant asserts that plaintiff's notice does not sufficiently or specifically satisfy the terms of the statute, we believe that it does so.

■ The purpose of the requirement for the described specificity is to facilitate the publisher's investigative efforts in determining whether state-

---

(1948) 32 Cal.2d 791, 797 [197 P.2d 713]. See *Noonan* v. *Rousselot* (1966) 239 Cal.App.2d 447, 454 [48 Cal.Rptr. 817].)

Further, we do not believe that the availability of exemplary damages need be predicated on a showing of malice toward each individual child in a case in which it may be shown that the defendant's misstatements about the children arose from "hatred or ill will" toward their mother. Exemplary damages are imposed "for the sake of example and by way of punishing a defendant" (Civ. Code, § 48a, subd. 4(c)) and one who libels an innocent party with whom he has no dispute in order to injure a third party may well be thought more reprehensible than an individual who libels only his antagonist. To interpret section 48a, subdivisions 2 and 4(d) ("no exemplary damages may be recovered unless the plaintiff shall prove that defendant made publication . . . with actual malice;" "actual malice is that state of mind arising from hatred or ill will toward the plaintiff . . ."), as barring such recovery unless each child could show that he was the personal subject of defendant's hatred would illogically grant greater protection to the disputants than to innocent individuals who may be deliberately injured; in light of the stated purposes of exemplary damages in the same provision (§ 48a, subd. 4(d)) we cannot accept such an interpretation.

[8]See Cliff, Galloway, Harvey, and Pretzler, *The Werner Case: A Therapy for Litigious Paranoics* (1952) 3 Hastings L.J. 136, 140. In 1945 the section was amended to extend its protection to slander by radio broadcast, see Comment (1945) 19 So. Cal.L.Rev. 119, 124-125.

[9]See 38 Cal.L.Rev. 951, 951-953 (1950); 2 Hastings L.J. 75, 76-77 (1951).

[10]Section 48a, subdivision 4(b), defines "special damages" as: "all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other." Plaintiff does not allege any special damages in this case.

[11]The text of section 48a is set out at footnote 4, *supra*.

ments in the initial article contained error and should be corrected. By designating the remarks that the objector considers libelous, a notice may enable the publisher to narrow the scope of his investigation. We recognize, however, that letters written to request retraction of a statement do not compose formal legal complaints; we cannot expect that they will conform to the niceties of common law pleading. In enacting section 48a the Legislature intended to afford publishers an opportunity to correct committed errors before subjecting them to liability; it did not intend to build technical barricades to recovery by the individual who had given notice sufficient to advise a reasonable publisher acting in good faith of the claimed error.

■ The crucial issue in evaluating the adequacy of the notice turns on whether the publisher should reasonably have comprehended which statements plaintiff protested and wished corrected. (*MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 554 [343 P.2d 36].)

■ The notice in the instant case labelled as libelous, and requested correction of, "every statement concerning the conduct of the children of Mrs. Inez Kapellas and every statement concerning Mrs. Kapellas' qualifications for the City Council and her suitability as a mother" contained in the specified articles. The first clause of the notice, designating every statement concerning the children's conduct as libelous, is both specific and comprehensible, especially when read in conjunction with the questioned article. The tenth paragraph of the editorial details several instances, appearing on the Alameda police blotter, involving three of the Kapellas children; these are the only statements relating specific actions performed by the children, and the notice's references to statements about the "conduct" of the children surely was sufficiently clear to inform defendant that it was these pronouncements that were objectionable. Although defendant contends that he could not ascertain that the notice attacked the accuracy of the statements about the children in the police blotter, the notice specified "every statement concerning the conduct of the children" in the article and should reasonably have been read to include the assertions in the police blotter.[12]

In *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, the defendant newspaper had published an article which included an intimation that another journal, a "Communist-line paper," had endorsed the plaintiff's candidacy for city office. Applying section 48a, this court upheld the adequacy of plaintiff's demand for correction which, after setting forth

---

[12]The demand provision of section 48a parallels the requirements of an earlier-enacted Minnesota retraction statute. Minnesota Statutes, section 548.06 (originally enacted as Minn. Gen. Laws 1887, ch. 191). In construing the identically worded specificity requirement of their statute in 1963, the Minnesota Supreme Court concluded that a notice, designating as libelous "all charges published . . . concerning the *conduct,* advice or actions [of the plaintiff]" was sufficiently specific to satisfy the statute. (*Mahnke* v. *Northwest Publications, Inc.* (1963) 266 Minn. 515, 520 [124 N.W.2d 411, 415].) (Italics added.)

the offending article, stated simply: "This article is grossly libelous and I therefore demand that the same be corrected or retracted as provided in Section 48(a) of the Civil Code of the State of California." We reasoned that since the original article referred only once to plaintiff the general notice sufficiently informed the publisher that plaintiff objected to the statement that referred to him. In light of the purpose of the specificity requirement of section 48a, we recognized that our concern centered on whether, given the nature of the statements in the article and the notice, the publisher should reasonably have "realize[d] what language plaintiff objected to and wished corrected." (52 Cal.2d at p. 554.)[13]

Defendant insists that *MacLeod* should be distinguished from the instant case because the article there was much shorter than the editorial here. The relative length of the article in *MacLeod,* however, became important only to the extent that it affected the comprehensibility of the notice and the ease of identifying the contested statement; length, in and of itself, cannot be determinative. Since we find that in the instant case the notice's reference to "every statement concerning the conduct of the children of Mrs. Kapellas" reasonably identifies the instances recounted "from the police blotter" in the editorial, and that the editorial taken as a whole does not alter the meaning of these statements, the fact that the statements comprise only a part of a longer article does not affect the adequacy of the notice.

Defendant further contends, however, that *Anderson* v. *Hearst Publishing Co.* (S.D.Cal. 1954) 120 F.Supp. 850, compels the opposite conclusion. In *Anderson* the allegedly libelous article contained eight separate references to the plaintiff; the plaintiff's demand for correction stated only that the article contained "certain statements regarding me which are untrue, libelous and damaging." The federal district court found this notice inadequate. As we noted when commenting on *Anderson* in *MacLeod,* the "certain statements" language failed to give the publisher any indication of the statements to which objections were levelled; on the other hand, the notice in the instant case, specifically directed to the statements' concerning the children's conduct, draws a clear distinction from the demand made in *Anderson.* (52 Cal.2d at p. 553.)

Since we uphold the sufficiency of the demand for retraction of the statements concerning the children's conduct, plaintiff would be entitled to maintain her libel action because of defendant's failure to correct these statements even in the face of non-specific additional requests in her notice.

[13]Cf. *Mahnke* v. *Northwest Publications, Inc., supra,* 266 Minn. 515, 522 [124 N.W.2d 411, 416]: "It is not indispensable that the demand for retraction specify each particular part of a published article, which contains false and defamatory matter. It is sufficient if, from the article and notice together, the publisher can without difficulty determine the words that contain the sting and which it is expected to retract." (See also, *Uhlman* v. *Farm Stock & Home Co.* (1914) 126 Minn. 239 [148 N.W 102, Ann.Cas, 1915D 888]; *Craig* v. *Warren* (1906) 99 Minn. 246 [109 N.W. 231].)

As we have pointed out, the crux of the matter lies in the adequacy of the notice to inform the publisher of the objectionable statements. ▮ A publisher cannot refuse to correct statements which are specifically identified because of the invalid generality of objections as to other matters not specifically identified.

▮ The second and third clauses of the notice ask for correction of "every statement concerning Mrs. Kapellas' qualifications for the City Council and her suitability as a mother." These demands are concededly less specific than the initial one, but, given the nature of the questioned editorials, their imprecision is justifiable. The editorials do not explicitly state that Mrs. Kapellas is not qualified for the city council or that she is an unsuitable mother, but a jury might reasonably find that the language, tone, and format of the editorial imply these conclusions.

We have long recognized that false inferences or implications raised by the arrangement and phrasing of apparently non-libelous statements can be as injurious as explicit epithets; we have upheld libel actions founded on such implications. (See, e.g., *Bates* v. *Campbell* (1931) 213 Cal. 438, 442 [2 P.2d 383] ("A defendant is liable for what is insinuated, as well as for what is stated explicitly"); *Bettner* v. *Holt,* 70 Cal. 270, 274 [11 P. 713] ("[N]ot only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning under all the circumstances attending the publication which such language may fairly be presumed to have conveyed to those to whom it was published."); *Cameron* v. *Wernick* (1967) 251 Cal.App.2d 890, 893 [60 Cal.Rptr. 102]; *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 411 [46 Cal.Rptr. 135].) ▮ When the basis of a claim of libel lies in an implication flowing from the rhetoric of a publication, the allegedly damaging implication frequently cannot be connected to any one statement, or to even a few specific statements, but rather emanates from the tone of the article as a whole. In such an instance, section 48a's requirement of a specific notice must be interpreted in light of the nature of the alleged libel. The mere withdrawal of specific statements may not be adequate to purge the original implication; thus the notice requesting correction will necessarily be tailored to the mis-impression given.

Since inferences drawn from an article may differ to some extent with each reader's subjective frame of reference, an adequate notice should inform the publisher which claimed implication of the article is allegedly libelous. Again, this requirement must be interpreted in a reasonable manner. ▮ ▮ In the instant case defendant's editorials purported to report as true a series of errant behavior by plaintiff's children "causing a great deal of bother for local police." The editorials also stated that plaintiff's work kept her away from home a good deal of the time. Plaintiff's notice asked for correction of "statement[s] concerning Mrs. Kapellas'

qualifications for the City Council and her suitability as a mother." Because the editorial contained no explicit basis for these conclusions, the defendant could reasonably infer that the plaintiff believed that the statements that were published about her and her children implied that she was an unsuitable mother and unqualified for city office.

Viewing the editorial "not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect upon the mind of the average reader" (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 547, quoting *Bates* v. *Campbell* (1931) 213 Cal. 438, 442 [2 P.2d 383]), we find that the article in question is reasonably susceptible to such an interpretation.[14] Under the circumstances Mrs. Kapellas could reasonably ask for a correction of the editorial's implications rather than for a retraction or rectification of any individual statement; we therefore conclude that the notice adequately satisfied the requirements of section 48a.

Nothing in the complaint or demurrer indicates that defendant encountered any difficulty in interpreting the notice. Under the facts as alleged defendant received the letter from plaintiff's attorney early in the statutory 20-day period but neither sought clarification nor so much as informed plaintiff or her counsel of the presently claimed ambiguity of the request.[15] Under these circumstances, "[w]e cannot believe that defendant was so unaware of the significance of what it printed that it did not realize what . . . plaintiff objected to and wished corrected." (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d at p. 554.)

3. *The third count fails to establish an actionable cause for an invasion of privacy*

 The third count of the amended complaint alleges that the editorial in question constitutes an actionable invasion of privacy of Mrs.

---

[14]In libel actions in which the questioned statement is susceptible to several interpretations, the initial function of the court is to determine whether the publication could reasonably have been understood to have a libelous meaning. It then becomes the jury's function to determine from the evidence which of the potential meanings was actually drawn by the readership. (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 546-547; *Maidman* v. *Jewish Publications, Inc., supra,* 54 Cal.2d 643, 651.) Thus if the jury should conclude that the readership did not draw the inferences from the editorials that plaintiff alluded to in her demand for correction, it would be compelled to find in favor of defendant with respect to the claimed libel arising from such implications.

[15]In an appropriate case evidence of a publisher's request for clarification of the demand would be admissible on the question of the reasonable clarity of the notice. Such evidence may also be admissible in mitigation of any claimed punitive damages (cf. *Turner* v. *Hearst* (1896) 115 Cal. 394, 401-402 [47 P. 129]), or to illustrate the defendant's good faith in rebutting a contention of malice. A request for clarification, of course, does not necessitate a finding that the original notice was inadequate. (See *Mahnke* v. *Northwest Publications, Inc.* (1963) 266 Minn. 515, 517 [124 N.W.2d 411, 413].)

Kapellas's minor children. Insofar as the claimed invasion of privacy rests on "the unwarranted publication by defendant of intimate details of [the children's] private [lives]" (*Coverstone* v. *Davies* (1952) 3 Cal.2d 315, 323 [239 P.2d 876], cert. den. *sub nom. Mock* v. *Davies* (1952) 344 U.S. 840 [97 L.Ed. 653, 73 S.Ct. 50]), this allegation states a cause of action separate and distinct from the initial libel count.[16] ■ In such an action a plaintiff does not rely upon the inaccuracy of the content of an article; instead, he charges that even if accurate the publication of the facts interferes with his "right to be let alone." (*Melvin* v. *Reid* (1931) 112 Cal.App. 285, 289 [297 P. 91].)

■ When such an assertion composes the gravamen of an action as to a right to privacy against a newspaper, the cause falls outside the category of cases for which section 48a contemplates coverage. Since the complaint does not rest upon the inaccuracy of a statement but upon the unwanted publicity resulting from an article, the private party gains no relief from a subsequent retraction or correction of the article but, on the contrary, suffers additional injury by the repeated exposure. We find no indication that in enacting section 48a, the Legislature intended to relieve newspapers from any effective sanction for violating an individual's right to privacy.[17]

■ The facts of the present case, however, do not support an action for this kind of invasion of privacy. With the expansion of the common law's protection of an individual's privacy,[18] came a concomitant recognition of an equally important, and constitutionally enshrined, competing interest of the public in information of newsworthy matters. Sensitive to the privacy tort's potential encroachment on the freedoms of speech and the

---

[16]Dean Prosser has identified four distinct torts, dealing with the invasion of four different interests of plaintiffs, which have been variously decided under the appellation of "right of privacy." His designation breaks down the general category into cases of (1) intrusion, (2) public disclosure of private facts, (3) false light in the public eye, and (4) appropriation. (Prosser, Law of Torts (3d ed. 1964) 829-851.)

Insofar as the instant plaintiff's right to privacy action is of the "false light in the public eye" variety, resting on the allegedly false nature of the editorial statements, we find the action is in substance equivalent to the children's libel claim, and should meet the same requirements of the libel claim on all aspects of the case, including proof of malice (cf. *Time, Inc.* v. *Hill* (1967) 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534]) and fulfillment of the requirements of section 48a. (See *Werner* v. *Times-Mirror Co.*, 193 Cal.App.2d 111, 122-123 [14 Cal.Rptr. 208].) Since the complaint contains a specific cause of action for libel, the privacy count, if intended in this light, is superfluous and should be dismissed.

[17]*Werner* v. *Times-Mirror Co., supra*, 193 Cal.App.2d 111, 120-123, involved a right of privacy action of the "false light in the public eye" variety and thus that court's decision, finding section 48a applicable, is consistent with our holding. Insofar as the *Werner* case includes language intimating that all privacy actions against newspapers are subject to section 48a, however, that language is disapproved.

[18]See generally, Prosser, *Privacy* (1960) 48 Cal.L.Rev. 383; Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193.

press, our courts have recognized a broad privilege cloaking the truthful publication of all newsworthy matters. (See *Coverstone* v. *Davies, supra,* 38 Cal.2d 315, 323; *Melvin* v. *Reid, supra,* 112 Cal.App. 285, 290; cf. *Spahn v. Julian Messner, Inc.* (1966) 18 N.Y.2d 324, 328,[274 N.Y.S.2d 877, 221 N.E.2d 543].)[19] Although the courts still have only hesitantly sketched the boundaries of the "newsworthy" category,[20] the facts published about the Kapellas children in the editorial in question clearly fall within the allowable limits evolved through the case law.

 In determining whether a particular incident is "newsworthy" and thus whether the privilege shields its truthful publication from liability, the courts consider a variety of factors, including the social value of the facts published, the depth of the article's intrusion into ostensibly private affairs, and the extent to which the party voluntarily acceded to a position of public notoriety. (See *Gill* v. *Curtis Publishing Co.* (1952) 38 Cal.2d 273, 278-279 [239 P.2d 630].[21] If the information reported has previously become part of the "public domain" or the intrustion into an individual's private life is only slight, publication will be privileged even though the social utility of the publication may be minimal. (See *Gill* w. *Hearst Publishing Co.* (1953) 40 Cal.2d 224 [253 P.2d 441] (publication of photograph of plaintiffs in public place not sufficiently intrusive); cf. *Metter* v. *Los Angeles Examiner* (1939) 35 Cal.App.2d 304, 312 [95 P.2d 491].) On the other hand, when the legitimate public interest in the published information is substantial, a much greater intrusion into an individual's private life will be sanctioned, especially if the individual willingly entered into the public sphere.[22]

Because of their public responsibilities, government officials and candidates for such office have almost always been considered the paradigm case of "public figures" who should be subjected to the most thorough scrutiny.[23] In choosing those who are to govern them, the public must, of course, be afforded the opportunity of learning about any facet of a

---

[19]In *Time, Inc.* v. *Hill, supra,* 385 U.S. 374, a case involving a variant of the right to privacy dealing with "fictionalization," the United States Supreme Court found that the Constitution, of its own force, establishes a qualified privilege for newsworthy publications. The court expressly did not reach the question whether the Constitution proscribes the imposition of any liability for the truthful publication of such matters in all cases. (385 U.S. at pp. 383 & fn. 7, 384 [17 L.Ed.2d at pp. 464, 465].)

[20]*Compare Melvin* v. *Reid, supra,* 112 Cal.App. 285 (disclosure of plaintiff's past life as a prostiute, 15 years after she had reformed, was actionable) *with Werner* v. *Times-Mirror Co., supra,* 193 Cal.App.2d 111 (redisclosure of scandal involving public district attorney, 30 years after the events, was not actionable).

[21]Compare the analyses suggested in Bloustein, *Privacy, Tort Law and the Constitution: Is Warren and Brandeis' Tort Petty and Unconstitutional as Well?* (1968) 46 Tex.L.Rev. 611, 622-627, and Note, *The Supreme Court, 1966 Term* (1967) 81 Harv.L.Rev. 69, 164-165.

[22]Cf. Prosser, *Privacy, supra,* 48 Cal.L.Rev. 383, 417.

[23]See, e.g., *Stryker* v. *Republic Pictures Corp.* (1951) 108 Cal.App.2d 191, 194 [238 P.2d 670]; Wright, *Defamation, Privacy and the Public's Right to Know: A*

candidate's life that may relate to his fitness for office. (See *Garrison* v. *Louisiana* (1964) 379 U.S. 64, 77 [13 L.Ed.2d 125, 134, 85 S.Ct. 209]; *Melvin* v. *Reid, supra,* 112 Cal.App. 285, 290.) Consequently, the press must be given ample "breathing space" to disseminate all information that may cast light on a candidate's qualifications. As the United States Supreme Court emphasized in *Garrison* v. *Louisiana, supra,* 379 U.S. 64, 74-75 [13 L.Ed.2d 125, 133, 85 S.Ct. 209], "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials.' *New York Times Co.* v. *Sullivan,* 376 U.S. [254 ] 270 [11 L.Ed.2d 686, 700, 84 S.Ct. 710, 95 A.L.R.2d 1412]."

Those who seek elected public position realize that in so doing they subject themselves, and those closely related to them,[24] to a searching beam of public interest and attention. (See *Stryker* v. *Republic Pictures Corp.* (1951) 108 Cal.App.2d 191, 194 [238 P.2d 670] ("A politician, running for public office, in effect, offers his public and private life for perusal so far as it affects his bid for office."); *Baldine* v. *Sharon Herald Co.* (W. D. Pa. 1966) 280 F.Supp. 440, 443; cf. *Cohen* v. *Marx* (1949) 94 Cal.App.2d 704, 705 [211 P.2d 320].) ▮ Generally, courts will be most reluctant to impede the free flow of any truthful information that may be relevant to a candidate's qualifications for office. Although the conduct of a candidate's children in many cases may not appear particularly relevant to his qualifications for office, normally the public should be permitted to determine the importance or relevance of the reported facts for itself.[25] If the publication does not proceed widely

*National Problem and A New Approach* (1968) 46 Tex.L.Rev. 630, 632, 636. See generally, Meiklejohn, *The First Amendment is an Absolute,* 1961 Sup.Ct.Rev. 245, 259.

[24]As we have noted, the extent to which an individual has voluntarily entered into the public sphere may be relevant in determining the protection to be afforded his privacy. (Cf. *Associated Press* v. *Walker* (1967) 388 U.S. 130, 154-155 [18 L.Ed.2d 1094, 1110-1111, 87 S.Ct. 1975].) In the instant case, however, the children on whose behalf this right to privacy count is maintained do not fit neatly into either of the somewhat artificial categories of "voluntary" or "involuntary" public figures. Although the pleadings give no hint of the extent to which the children themselves influenced the decision which propelled them onto the wide screen of public scrutiny, their desires for anonymity and seclusion were probably considered by Mrs. Kapellas before she decided to seek public office. Whatever legal label we may attach to the status of the children in this matter, we must hold that the nonconfidential nature of the disclosed conduct renders the publication privileged. (Cf. *Carlisle* v. *Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 747 [20 Cal.Rptr. 405] ("a necessary corollary [to the relinquishment of a public figure's right to privacy] is that people closely related to such public figures . . . must also to some extent lose their right to the privacy that one unconnected with the famous or notorious would have").)

[25]Family members, or others closely associated with newsworthy individuals, have been precluded from maintaining actions for invasion of privacy under circumstances

beyond the bounds of propriety and reason in disclosing facts about those closely related to an aspirant for public office, the compelling public interest in the unfettered dissemination of information will outweigh society's interest in preserving such individuals' rights to privacy.[26] The children's loss of privacy is one of the costs of the retention of a free marketplace of ideas.

■■■ The editorial in question purports to disclose only incidents which had initially been recorded on the Alameda police blotter; such events would already have been matters of public record. (Cf. *Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d 733 (marriage an event "of public record" and disclosure does not violate right to privacy); *Aquino* v. *Bulletin Co., supra,* 190 Pa. Super. 528 [154 A.2d 422] (same for divorce).) Thus we are not faced with an article which intrudes deeply into the children's privacy by revealing incidents of a wholly private or confidential nature.[27] Newspapers have traditionally reported arrests or other incidents involving suspected criminal activity, and courts have universally concluded that such events are newsworthy matters of which the public has the right to be informed. (See, e.g., *Coverstone* v. *Davies, supra,* 38 Cal.2d 315, 323; *Firth* v. *Associated Press* (E.D.S.C. 1959) 176 F.Supp. 671.) Although the publication of such information long after the events occurred may in some cases not be privileged if the reported instances have lost all public importance (see *Melvin* v. *Reid, supra,* 112 Cal.App. 285; cf. *Maidman* v. *Jewish Publications, Inc., supra,* 54 Cal.2d 643, 653. But cf. *Werner* v. *Times-Mirror Co., supra,* 193 Cal.App.2d

in which the societal interest in disclosure was much less compelling than in the instant case. (See, e.g., *Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d 733 (action by former husband of girl who later became famous movie actress barred); *Estate of Hemingway* v. *Random House, Inc.* (1966) 49 Misc.2d 726 [268 N.Y.S.2d 531] (Sup.Ct.) (suit by Ernest Hemingway's widow dismissed); *Aquino* v. *Bulletin Co.* (1959) 190 Pa.Super. 528 [154 A.2d 422] (suit by parents of girl who was newsworthy because of rapid marriage and divorce barred).)

[26]As Judge J. Skelly Wright has pointed out, we do not merely compare the interest of an individual in his privacy with the interest of society in the free dissemination of information; we must recognize a general interest in preserving each individual's right to privacy. (Wright, *Defamation, Privacy and the Public's Right to Know: A National Problem and a New Approach* (1968) 46 Tex.L.Rev. 630, 634.) The societal interest in protecting the privacy of those who are closely related to aspirants for public office, however, is generally overborne by the critical public need for information by which to evaluate these candidates.

[27]Even when the subject of commentary is a public official or one closely related to an official, the disclosure of some matters may constitute such an invasion into the individual's private life with so little social justification that the publication may be unprivileged. The United States Supreme Court, in *Time, Inc.* v. *Hill, supra,* 385 U.S. 374, 383, fn. 7 [17 L.Ed.2d 456, 464, 87 S.Ct. 534], expressly did not reach the question whether the federal Constitution precludes recovery in connection with a true publication "where '[r]evelations may be so intimate and so unwarranted in view of the victim's position as to outrage the community's notions of decency.' *Sidis* v. *F.-R. Pub. Corp.*, 113 F.2d 806, 809 [138 A.L.R. 15](2d Cir.), cert. denied, 311 U.S. 711 [85 L.Ed. 462, 61 S.Ct.393] (1940)."

111, 122-123), the candidacy of the children's mother in the circumstances of the instant case rendered this past behavior significant and newsworthy.

Given the importance of public access to all relevant information about candidates for public office and the non-confidential nature of the reported conduct, the statements about the Kapellas children, if true, must be considered absolutely privileged. Thus the court properly sustained the demurrer to the cause of action alleging an invasion of the privacy of plaintiff's children.

The judgment of dismissal of the third count is affirmed. The judgment of dismissal of the first two counts is reversed with directions to the trial court to overrule the demurrer as to these two counts and allow defendant to answer.

Traynor, C. J., Peters, J., and Sullivan, J., concurred.

**BURKE, J.**—I concur in the opinion to the extent it holds that the third count fails to state a cause of action for breach of privacy. I disagree, however, with the conclusion that the first and second counts are sufficient to state causes of action for libel.

Since the third amended complaint seeks general and exemplary damages under two separate libel counts, one on behalf of Mrs. Kapellas, and one on behalf of her children, both counts must allege compliance with section 48a of the Civil Code, which requires written demand for retraction and proof of actual malice.

Although the demand for retraction may have been sufficient to support the children's count, the opinion errs in assuming that Mrs. Kapellas therefore is entitled to maintain her own action "even in the face of non-specific additional requests in her notice." (*Ante,* p. 32.)

The demand for retraction was inadequate with respect to Mrs. Kapellas' libel count, for section 48a, subdivision 1, requires "a written notice *specifying the statements* claimed to be libelous and demanding that the same be corrected." (Italics added.) The word "specify" is defined as "To mention or name in a specific or explicit manner; to tell or state precisely or in detail. . . ." (Webster's New Internat. Dict. (2d ed.) at p. 2415.) Where the libel is alleged to consist solely of implications, plaintiff should specify the exact statements from which these implications arise.

Mrs. Kapellas' demand did not request retraction of "implications" but referred to "every *statement* concerning Mrs. Kapellas' qualifications for the City Council and her suitability as a mother." (Italics added.) This language was clearly insufficient, for as the opinion points out, "The

editorials do not explicitly state that Mrs. Kapellas is not qualified for the city council or that she is an unsuitable mother. . . ." (*Ante,* p. 33.)

With respect to the sufficiency of the allegations of actual malice, no facts are alleged which would support a finding that defendant acted with "hatred or ill will" toward the Kapellas children. (Civ. Code, § 48a, subd. 4(d).) Although the opinion correctly holds that Mrs. Kapellas sufficiently alleged facts disclosing actual malice toward her, those allegations would not support her children's libel count.

I would conclude that the first count is insufficient because of the inadequacy of the notice of retraction, and that the second count is insufficient, as to exemplary damages, because it fails to allege facts disclosing actual malice.

McComb, J., and Mosk, J., concurred.

Respondent's petition for a rehearing was denied November 19, 1969, and the opinion was modified to read as printed above. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.